## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DONOVAN REALTY, LLC,** *et al.*, | : | |
| | : | |
| **Plaintiffs/Counterclaim-Defendants,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 20-3954** |
| | : | |
| **CAMPERS INN HOLDING CORP.,** *et al.*, | : | |
| | : | |
| **Defendants/Counterclaim-Plaintiffs.** | : | |

## MEMORANDUM

**TUCKER, J.**                                                                    **November 10, 2021**

Before the Court are Defendants/Counterclaim Plaintiffs' ("Buyers")[1] Motion for

Preliminary Injunction (ECF No. 9), Plaintiffs/Counterclaim Defendants' ("Sellers")[2] Motion for

Partial Judgment on the Pleadings (ECF No. 15), and Buyers' Response in Opposition to the

Motion (ECF No. 22).

Upon careful consideration of the Parties' submissions, and for the reasons outlined

below, Defendants' Motion for Preliminary Injunction (ECF No. 9) is **DENIED AS MOOT**;[3]

Plaintiffs' Motion for Partial Judgment on the Pleadings (ECF No. 15) is **DENIED**.

---

[1] Defendants/Counterclaim Plaintiffs are Campers Inn Holding Corporation; CI of Hamburg, LLC; and CI of West Coxsackie, LLC (collectively, "Buyers").

[2] Plaintiffs/Counterclaim Defendants are Donovan Realty, LLC; DD&A Tilden Realty, LLC ("DD&A Tilden"); Zerteck, Inc.; Tilden Recreational Vehicles, Inc. ("Tilden Recreational"); and Derwood Littlefield (collectively, "Sellers").

[3] Buyers filed a Motion for Preliminary Injunction to stop Sellers from conveying the subject matter properties. On August 25, 2020, Buyers filed a notice of *lis pendens*. ECF No. 11. At the October 6, 2021 Rule 16 Conference Sellers informed the Court that they have already sold the property to a third party, in the face of the *lis pendens*. Because the property was already sold, the motion (ECF No. 9) cannot be granted and is, therefore, moot. This, however, does not foreclose the Court's ability to unwind the alleged sale, if it later determined that Sellers violated the terms of their contract. Thus, this Court will address Sellers' alleged sale at the end of discovery, during dispositive motions or, in the alternative, at trial.

I.     **FACTUAL AND PROCEDURAL BACKGROUND**[4]

**A. The Parties**

The current matter arose out of a failed real estate and asset transaction between the

Parties.  Sellers Zerteck and Tilden Recreational operate dealerships in Greene County, New

York and Berks County, Pennsylvania. Pls.' Compl. ¶ 12; *see also* Defs.' Countercl. ¶ 3. There,

they sold and serviced recreational vehicles and boats. *Id.*  Donovan Realty and DD&A Tilden

own the real estate on which the dealerships are situated. Pls.' Compl. ¶ 12; *see also* Defs.'

Countercl. ¶ 4. The dealerships are commonly known as the "Boat N RV Superstore" and "Boat

N RV Warehouse."  Defs.' Countercl. ¶ 3.

Buyer Campers Inn owns and operates approximately twenty-seven recreational vehicle

dealerships throughout the East Coast and Midwest, including Pennsylvania. Pls.' Compl. ¶ 13;

*see also* Defs.' Countercl. ¶ 5.

**B. The Terms of the Parties' Agreements**

In January of 2020, Campers Inn expressed interest in purchasing Zerteck and Tilden's

Recreational vehicle sales and service operations in Berks and Greene County. Pls.' Compl. ¶ 14;

*see also* Defs.' Countercl. ¶ 6. From Campers Inn's perspective, both locations met a strategic

need; they were established and well-known businesses with developed properties. Defs.'

Countercl. ¶ 7.

Following a month of negotiations, the Parties entered into an Asset Purchase Agreement

("APA") on February 4, 2020. Pls.' Compl. ¶ 15; *see also* Defs.' Countercl. ¶ 8. Zerteck and

Tilden Recreational agreed to sell all, or substantially all, of their assets relating to the sales and

service of recreational vehicles in New York and Pennsylvania to Campers Inn. *Id.*

---

[4] This section draws from Sellers' Complaint (ECF No. 1) and Buyers' Counter-Complaint (ECF No. 8).

Contemporaneous with the execution of the APA, Campers Inn, DD&A Tilden, and Donovan

Realty entered into an Agreement for Purchase and Sale of Real Estate and Related Property

("RPA"). Pls.' Compl. ¶ 16; *see also* Defs.' Countercl. ¶ 9. Per the RPA:

1. Donovan Realty agreed to transfer certain real estate and
   improvements in New York to Campers Inn or its assign(s); and

2. DD&A Tilden agreed to transfer certain real estate improvements
   in Pennsylvania to Campers Inn or its assign(s).[5]

*Id.* Both agreements are governed by New York law. Pls.' Compl. ¶ 19; *see also* Defs.'

Countercl. ¶ 12.

Under the agreements, the transactions were to close "five business days after notice by

Buyer to Seller that the conditions to close…have been satisfied…provided, however, that the

Closing shall take place on or before April 15, 2020, time being of the essence." Pls.' Compl. ¶

20; *see also* Defs.' Countercl. ¶ 18. The Parties agreed to place one hundred thousand dollars

($100,000.00) of the purchase price in escrow pending the transactions closing or termination of

the agreement. Defs.' Countercl. ¶ 13.

The Parties also agreed to a "No Shop" provision which required Sellers to: (1) forgo

other offers for the dealership operations or real property through closing or termination; (2)

identify any inquiries or offers received from others during the pendency of the Parties'

transactions; and (3) promptly put Buyers on notice, inform them of the identity of the

prospective purchaser or soliciting party, and the terms of their proposal. Defs.' Countercl. ¶ 14.

The Parties had due diligence obligations under the Agreements. Buyers plead that the

RPA required Sellers to provide certain materials regarding the New York and Pennsylvania

---

[5] Subsequently, Campers Inn assigned its rights, under the RPA, to the Pennsylvania property to CI Hamburg and its rights to the New York property to CI West Coxsackie. Defs.' Countercl. ¶ 10.

properties, which they defined as "Diligence Materials." Defs.' Countercl. ¶ 15. The materials

included:

> (a) copies of any existing surveys prepared by any survey or engineering company, if any, as well as any of the most recent title insurance policy or commitment for title insurance with respect to the Property;
>
> (b) all existing soil reports, boundary and/or improvement surveys, and other similar materials relating to the Property; together with all physical inspection, engineering, and test reports, including, but not limited to environmental reports, and written investigations or assessments with respect thereto;
>
> (c) copies of any unrecorded agreements made by Seller relating to the Property which will survive the Closing under this Agreement, and any current notices which Seller has received from any governmental entities regarding the Property;
>
> (d) a copy of the most recent appraisal of the Property;
>
> (e) any pertinent available plans, drawings[,] or specifications with respect to the improvements which are currently located on the Property; and
>
> (f) any other items deemed reasonably necessary by Buyer to conduct inspection…

*Id.* (citing Pls.' Compl., Ex. B, § 4). Sellers agreed to convey "marketable fee simple title

of record to the Land and Improvements to [Buyers] by a recordable warranty deed…in a

form reasonably acceptable to [Buyers] and the Title Insurer…" *Id.* ¶ 16 (citing Pls.'

Compl., Ex. B, § 5(d)).

Moreover, Sellers agreed that they would, "at Buyer[s'] request and without

further consideration[,] execute and deliver to Buyer[s] such additional instruments of

transfer, conveyance and assignment as Buyer may reasonably request to evidence more

effectively the transfer, conveyance of the Purchased assets to Buyer[s]…" Defs.'

Countercl. ¶ 17 (citing Pls.' Compl., Ex. A, § 4.16).

Likewise, Buyers agreed to certain conditions precedent to effectuate the transaction.

Sellers' Complaint pleads that the APA authorized Buyers and their broker, Haig Partners, to

make a public announcement regarding the Parties' transaction. Pls.' Compl. ¶ 21. The

Agreement further provided:

> All conditions precedent to Buyer[s'] performance *shall be deemed satisfied* in the event Buyer[s] authorizes any public announcement of the Transactions by Haig Partners or by the commencement of any operations by Buyer[s] at the Properties, including operations utilizing Seller[s'] employees.

*Id*. (citing Ex. A § 6.1 (emphasis added)).

Finally, the APA contained remedies in case either party failed to perform their

obligation.  In the event of a breach, the Parties agreed to: (1) specific performance of the

Agreements; (2) the right to temporary and permanent injunctive relief; and (3) the right to

recover reasonable attorneys' fees. Pls.' Compl. ¶ 23; *see also* Defs.' Countercl. ¶ 19.

### C.  COVID-19 and Buyers' Inability to Perform Its Obligations Under the Agreements

Following the execution of the Agreements, Buyers placed one hundred thousand dollars

($100,000.00) in escrow in Philadelphia as an initial deposit. Pls.' Compl. ¶ 25. On March 9,

2020, after Buyers conducted their diligence, the Parties authorized Haig Partners to issue a press

release announcing the sale, memorialized in the Parties' documents. *Id*. at 26. Thus, Sellers

plead that all conditions precedent to Buyers' performance were deemed satisfied on March 9,

2020 and they increased the deposit amount to an aggregate of two hundred fifty thousand

dollars ($250,000.00).  *Id*. at 27.

However, following this deposit, the COVID-19 pandemic erupted. Both Governor Tom

Wolf and former Governor Andrew Cuomo announced shutdowns of non-essential government

services and businesses in Pennsylvania and New York, respectively, on March 16 and 20, 2020.

Defs.' Countercl. ¶¶ 21-22.  Predictably, these shutdowns greatly impacted Buyers' ability to

move forward with its pre-closing obligations.

Sellers plead that Buyers did not order or procure any surveys for the real estate and improvements, subject to the RPA, between February 5, 2020 and April 15, 2020. Pls.' Compl. ¶ 30. Buyers' counterclaim, however, asserts that as of mid-to-late March, Buyers were unable to obtain new surveys and title work, necessary for financing the transaction with M&T Bank as offices were not open nor were they permitted to resume operations. Defs.' Countercl. ¶ 24.

As the April 15, 2020 closing date approached, Sellers threatened to seek disbursement of the Deposit Funds if Buyers were unable to close. Defs.' Countercl. ¶ 25. Buyers informed Sellers that the ongoing pandemic, and accompanying shutdowns, rendered it impossible to perform their pre-closing obligations. *Id*. ¶ 26. Buyers additionally stated that it considered exercising their right to terminate the Agreements because of: (1) the impact of the pandemic's severe economic downturn on the market for recreational vehicles; and (2) the value of Sellers' dealerships and properties. *Id*. ¶¶ 27-28.

On April 17, 2020, after the Parties failed to close on the properties, Sellers sent a letter to the escrow agent requesting release of Buyers' deposit. Pls.' Compl. ¶¶ 31-32. Sellers' attitude changed, however, because on April 24, 2020, the Parties agreed to an Addendum to the Agreements and extended the deadlines. Pls.' Compl. ¶ 33; *see also* Defs.' Countercl. ¶ 29.

**D.  The Parties' Addendum and the Extension of Deadlines**

In the Addendum, the Parties acknowledged that Buyers were unable to close by the April 17, 2020 date because they had "not yet applied for or [had] otherwise been unable to obtain certain licenses to operate the businesses in New York and Pennsylvania and to fulfill other conditions necessary for its underlying financing." Defs.' Countercl. ¶ 30. In response, they amended § 7.1 of the APA, the "Time, Date and Place of Closing" provision. *Id*. ¶ 31.

The Addendum provided, *inter alia*, that:

(1) the real estate transactions' closing date extended to no later than 5:00 p.m. on July 31, 2020;

(2) a mechanism exists to push the closing of the personal property assets to a later date than the real estate closing, on or before September 30, 2020; and

(3) Buyers increase the escrow deposit to seven hundred fifty thousand dollars ($750,000.00).

Pls.' Compl. ¶ 33; *see also* Defs.' Countercl. ¶ 31.

Buyers plead that the July 31, 2020 date was chosen because it was the Parties' best estimate as to when the pandemic would subside and, thus, complete the transactions. Defs.' Countercl. ¶ 32. Furthermore, the ongoing and escalating pandemic caused uncertainty; mainly, government offices and businesses remained shut down. *Id*. ¶ 33. Thus, the Parties did not include "time is of the essence" language in their Addendum, as they did in the pre-pandemic Agreements. *Id*.

The Parties agreed to move the closing date again, should similar difficulties continue. Defs.' Countercl. ¶ 35. Section 3(e) of the Addendum modified the RPA, in pertinent part, and stated:

> [I]f real estate surveys are promptly ordered, but not completed due to no fault of buyer, period for identification of title defects extended for at least three (3) business days after delivery of the Surveys (and closing is extended accordingly). Buyer[s] will seek to obtain all of the approval, surveys, and other required items promptly and work in good faith to obtain them on a timely basis. In addition, Buyer[s] shall identify to Seller the vendor(s) chosen by Buyer[s] to perform such work in New York and Pennsylvania, respectively. If, however, such items are not obtained on or prior to the Closing Date, then closing shall be delayed until such time as such items are received from the identified vendor(s).

*Id*. (citing Pls.' Ex. F, § 3(e)). Sellers plead, due to Buyers' "dawdling from February 4 through April 24 [of 2022]," they required, and the Addendum reflected, that Buyers act "promptly" and "on a timely basis." Pls.' Compl. ¶ 36.

The Sellers were required to turn over any: (1) tax receipts from applicable taxing authorities; (2) receipt of certificates of occupancy; and (3) zoning compliance/building code violation letters with respect to the Properties, as outstanding conditions precedent of closing. Defs.' Countercl. ¶ 36. Finally, as part of the Addendum, the Parties agreed to reduce the purchase price by approximately five percent. *Id*. ¶ 37

### E.  Post-Addendum Activities and Performance

Contrary to the Parties' best efforts to predict its conclusion, the pandemic is still ongoing at the time of this writing. Government and business shutdown orders remained in place from May until July of 2020. Defs.' Countercl. ¶ 38. Here, though, the Parties' pleadings begin to diverge.

Sellers plead Buyers failed to take any steps to complete their obligations in April or May, following the Addendum, and had not identified the vendors selected to perform the surveys and title work until mid-May. Pls.' Compl. ¶¶ 38-39. Buyers, however, plead they attempted to complete the required closing conditions, but a continued obstacle was obtaining surveys for the Berks and Green County properties. Defs.' Countercl. ¶ 40. Buyers point to two main issues: (1) Sellers repeatedly represented that they did not have copies of existing surveys even though they were required to provide this to Buyers under the RPA; and (2) survey companies were not yet fully open, and they had a significant backlog, some of up to five weeks or more.  *Id*. ¶¶ 340-41.

Sellers, fearing more delays, emailed Buyers on May 15, 2020, and asked whether Buyers had "identified their surveyors, title offices, etc.," but Buyers did not respond to the email. Pls.' Compl. ¶ 40. Buyers reached out to Sellers in late June "once again"[6] regarding the existence of any pre-existing surveys of the properties. Pls.' Compl. ¶ 41; *see also* Defs.' Countercl. ¶ 43. Sellers obtained the prior surveys and, on June 26, 2020, forwarded the copies to Buyers. Pls.' Compl. ¶ 42; *see also* Defs.' Countercl. ¶ 43. Sellers also provided Buyers with a Pennsylvania Department of Transportation survey and drawing of the south parcel of the Berks County property on July 6, 2020.[7] Pls.' Compl., n.1.

On July 7, 2020, a surveyor appeared at the Pennsylvania property but by middle of July, Sellers had not observed any other activity by Buyers to prepare for closing. Pls.' Compl. ¶ 48. Fearing the worst, Sellers emailed Buyers again, on July 20, 2020, and asked: (1) whether the surveys were completed; (2) who performed it; (3) who prepared the instruments of transfer; (4) did Buyers find a company to do both the New York and Pennsylvania real estate properties' closing simultaneously; and (5) whether Buyers expected anything from Sellers. *Id.* ¶ 50. Buyers never responded to the email, but the Parties spoke by phone three days later. *Id.* ¶¶ 51-52. That same day, another surveyor appeared, this time at the New York property, and a closing agency contacted Sellers regarding the Pennsylvania property. *Id.* ¶¶ 53-54. Sellers assert that only on July 24, 2020 did Buyers' counsel identify title officers and surveyors for both properties' locations. *Id.* ¶ 55. Finally, on July 27, 2020, four days to closing, M&T Bank informed them that Buyers had not ordered a survey for the New York property. *Id.* ¶ 56.

---

[6] It should be noted, however, that Buyers fail to mention when exactly they reached out to Sellers about the surveys prior to this vague "late June" date.

[7] Sellers assert that they "promptly and readily" assisted Buyers to bring the transaction to a successful close by the end of June 2020, but Buyers had not identified any surveyor they had retained in either New York or Pennsylvania. Pls.' Compl. ¶ 44.

With the pre-existing surveys, Buyers' surveyors were able to perform the required work on the Pennsylvania and New York properties in July of 2020. Defs.' Countercl. ¶ 43. More accurately, however, the surveyor was only able to complete the surveys, in a form sufficient to satisfy the Agreements' requirement to convey marketable title, on July 30, 2020. *Id*. ¶ 44. Some of the delay was because the title company noted several deficiencies with Sellers' title to the Berks County property, as well as erroneous legal descriptions of the property contained in Sellers' prior title documents.[8] *Id*. ¶ 46. Regardless, Buyers continued to push to make the July 31 closing date. *Id*. ¶ 45.

On July 29, 2020, Legacy Title Company, the New York title company, contacted and provided Sellers with documents which they executed; notably, the recording tax information in the invoice statement did not match the Parties' transaction documents and the title company asked for a correction. Pls.' Compl. ¶ 58. Likewise, the Pennsylvania title company provided Sellers with the title documents, the following day, but with the notation that "the deed cannot yet be signed as it does not have the legal description attached." *Id*. ¶ 59.

### F.  M&T Bank and Failure to Close on July 31, 2020

M&T Bank ("M&T") served as both lender and funder to Sellers and Buyers. Pls.' Compl. ¶ 56. M&T established an internal deadline of 2:00 p.m. on July 31, 2020, for the review of the Parties' documents and approval financing the transaction. Pls.' Compl. ¶ 64; Defs.' Countercl. ¶ 47. Unfortunately, the Parties did not meet the deadline.

On Friday, July 31, from 11:00 a.m. to 12:30 p.m., Sellers executed documents to close on the transaction, but at 1:06 p.m., Buyers sent additional documents for review and execution; Sellers signed and executed the documents. Pls.' Compl. ¶¶ 61-62. However, Sellers failed to

---

[8] These errors had to be addressed and cured before closing or M&T Bank, Buyers' financer, would not approve the closing. Defs.' Countercl. ¶ 46.

provide certificates of occupancy and zoning compliance/building compliance letters at closing, as required under § 3(e) of the Addendum. Defs.' Countercl. ¶ 48.

At 1:47 p.m., after Sellers executed the last batch of documents, Buyers informed Sellers of M&T's 2:00 p.m. deadline. Pls.' Compl. ¶ 63.  Accordingly, on July 31, 2020, an M&T representative informed the Parties that, because the final transaction documents had not been provided to the bank for review prior to the 2:00 p.m. deadline, it would not be funding the transaction. Pls.' Compl. ¶ 64; Defs.' Countercl. ¶ 48.

On Sunday, August 2, 2020, Sellers demanded the Philadelphia escrow agent release the deposit to Sellers. Pls.' Compl. ¶ 68. The next day, Buyers objected to the release and sent Sellers a letter that informed them that closing would be delayed for up to three business days, pursuant to § 3(e) of the Addendum to permit time to correct the title defects.[9] Defs.' Countercl. ¶ 49. Buyers informed Sellers of their continued obligation to cure defects and the required documents Buyers needed. *Id*. ¶¶ 49-52. Sellers, however, never responded to the document request and, instead, commenced this suit on August 13, 2020. *Id*. ¶ 55.

### G. Sellers Alleged Violation of the "No Shop" Provision

Buyers plead that while Sellers maintained radio silence, a surveying and title work provider they had previously used on Sellers' properties informed them that Buyers' direct competitor had requested survey and title work to be performed on the same two properties Buyers attempted to acquire from Sellers. Defs.' Countercl. ¶ 56. According to Buyers' Counterclaims, survey and title work are generally done before a commercial real estate transaction is completed; thus, Buyers are under the belief that Sellers' refusal to proceed with

---

[9] On July 31, 2020, at 2:35 p.m., Legacy Title generated a new closing invoice which still had not corrected the Parties' agreement concerning the recording tax.

closing was because they attempted to sell the businesses and real estate to Buyers' direct competitor for a higher price. *Id*. ¶¶ 57-58.

### H. Procedural History

As stated above, Sellers commenced this action on August 13, 2020 to which Buyers, twelve days later, filed their Answer and Counterclaim. ECF Nos. 1 and 8. The same day Buyers filed their Counterclaim, Buyers filed a Motion for Preliminary Injunction and a Notice of *Lis Pendens*. ECF Nos. 9 and 11. On August 28, 2020, Sellers filed their Motion for Partial Judgment on the Pleadings. ECF No. 15.

## II.   <u>**LEGAL STANDARD**</u>

Under Federal Rule of Civil Procedure 12(c), a party may move for judgment on the pleadings after the pleadings are closed, as long as the party does so early enough not to delay trial. Fed. R. Civ. P. 12(c). Such a motion can only be granted "if, on the basis of the pleadings, the movant is entitled to judgment as a matter of law." *Fed Cetera, LLC v. Nat'l Credit Servs.*, 938 F.3d 466, 469 n.7 (3d Cir. 2019) (quoting *DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 262 (3d Cir. 2008)).

Courts in this circuit construe motions for judgment on the pleadings under the same standard as motions to dismiss, made pursuant to Rule 12(b)(6). *Katzenmoyer v. City of Reading*, 158 F. Supp. 2d 491, 496 (E.D. Pa. 2001). "The only notable difference between these two standards is that the court in a motion on the pleadings reviews not only the complaint but also the answer and written instruments attached to the pleadings." *Spragues v. Neil*, No. 05-1605, 2007 WL 3085604, at *2 (M.D. Pa. Oct. 19, 2007) (citation omitted).

A Rule 12(b)(6) Motion to Dismiss seeks to test the sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). The touchstone of that pleading standard is

plausibility.  *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations and quotations omitted). Facial plausibility requires more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* A plaintiff will not prevail if he provides only "labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). Instead, the plaintiff must detail "enough facts to raise a reasonable expectation that discovery will reveal evidence of 'each necessary element of the claims alleged in the complaint.'" *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556 (2007)).

The Third Circuit sets forth a three-part test that district courts must apply when evaluating whether allegations survive a 12(b)(6) motion to dismiss. *Santiago v. Warminster Township*, 629 F.3d 121 (3d Cir. 2010). A court must: (1) identify the elements of the claim; (2) review the complaint to strike conclusory allegations; and (3) look at the well-pleaded components of the complaint and evaluate "whether all the elements identified in part one of the inquiry are sufficiently alleged." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). If the complaint fails to do so, the motion to dismiss will be granted. Finally, a court must accept as true all factual allegations contained in a complaint and interpret them in the light most favorable to the plaintiff. *Argueta v. U.S. Immigration & Customs Enf't.*, 643 F.3d 60, 74 (3d Cir. 2011).

## III.   <u>ANALYSIS</u>

Sellers' request that this Court grant its Motion for Partial Judgment.  They seek: (1) judgment as to Count I for breach of contract, and the $750,000 in escrow; (2) judgment as to Count II, declaring that Sellers properly terminated the Parties' contract following Buyers'

material breach; (3) judgment for Sellers, dismissing Buyers' demand for specific performance; and (4) an order striking the Buyers' *lis pendens* against the subject properties. Pls.' Br. at 2-3.

Buyers oppose and argue: (1) this Court must defer to the facts pleaded in Buyers' Counterclaim, as the non-moving party; and (2) Sellers are improperly applying provisions of the contract that are in the face of contract construction rules and interpretation. Defs.' Br. at 3.

This Court rejects Sellers arguments and denies each request. Buyers did not materially breach the contract nor are Sellers entitled to Declaratory Judgment. Moreover, based on the pleadings, Buyers Counterclaim is proper. Finally, at this time, Buyers still maintain a contractual interest in the property; thus, striking the *lis pendens* would be premature.

### A. Counts I and II - Breach of Contract and Declaratory Judgment Claims

Sellers argue Buyers breached the contract when they failed to close by the extended real estate closing deadline of July 31, 2020. Sellers contend they performed all conditions precedent to Buyers' obligation to close, and in the alternative, Buyers did not request any additional documents prior to their August 3rd Letter. Pls.' Br. at 9-11. Sellers assert that Buyers materially breached by failing to close by the "of the essence" deadline.[10] *Id*. at 11.

Moreover, Sellers maintain that this Court should grant their Declaratory Judgment claim because, under the APA, they were entitled to terminate the agreement if they were "ready, willing[,] and able to close and not in material default of its obligation." Pls.' Br. at 13 (citing Exs. A (§9.1(c)) and B (§§1(b) and 14).

Buyers plead in their Counterclaim that the Parties' Addendum did not include a "time is of the essence" clause because of the escalating uncertainty around COVID-19. Defs.' Br. at 7. Buyers also contend that the rules of contract construction and interpretation foreclose the "time

---

[10] Pursuant to the initial agreements, the Parties included "time being of the essence" language. Pls.' Compl. Ex. A, §7.1; Ex. B, §9.

is of the essence" clause from attaching. *Id*. at 8. The Parties separated the closing date of the

asset purchase transaction and the real estate, never mentioning "time is of the essence" in the

Addendum. *Id*. at 9. Finally, Buyers argue Sellers failed to produce missing documentation on or

prior to the July 31 closing date. *Id*. at 13.

This Court finds Sellers' arguments unpersuasive; Buyers' Counterclaim pleads enough

facts to prove that they did not breach the contract. To prevail on a breach of contract claim, a

plaintiff must establish: "(1) the existence of an agreement; (2) performance of the contract by

plaintiff; (3) breach of the agreement by defendant; and (4) damages." *Rabin v. Mony Life Ins.*,

No. 06-775, 2007 WL 737474, at *2 (S.D.N.Y. March 8, 2007) (citing *Harsco Corp. v. Segui*, 91

F.3d 337, 348 (2d Cir. 1996)). Based on the pleadings, Sellers' Complaint, the accompanying

exhibits, and Buyers' Counterclaim, the third element is not met.[11]

Under the Addendum, Sellers were required to provide any (1) tax receipts from

applicable taxing authorities; (2) receipt of certificates of occupancy; and (3) zoning

compliance/building code violation letters with respect to the Properties, as outstanding

conditions precedent of closing. Defs.' Countercl. ¶ 36; *see also* Pls.' Compl., Ex. F, § 3(e).

Moreover, the Addendum provided a mechanism to delay the closing date. It states, in pertinent

parts:

> [E]xcept that if real estate surveys are promptly ordered, but not
> completed due to no fault of buyer, period for identification of title
> defects extended for at least three (3) business days after deliver of
> the Surveys (and closing is extended accordingly) … If, however,
> such items are not obtained on or prior to the Closing Date, then
> closing shall be delayed until such time as such items are received
> from the identified vendor(s).

---

[11] Buyers' Counterclaim pleads that Sellers did not provide requested documents necessary for closing, which raises the issue of whether the second element was met. Defs.' Countercl. ¶¶ 53-54. However, because the third element is clearly not met, the Court will not address the second element at this time.

Ex. F, §3(e).  The Addendum also contained an "Additional Delay(s)" provision, § 3(f), which

dictates that:

> Buyer shall execute a letter of instruction to the Escrow Agent in a
> form suitable to Seller which shall remain in the possession of Seller
> until the later of: (a) 5:01 p.m. on July 31, 2020, or (b) if the Closing
> is postponed to a date past July 31, 2020, due to title defects as set
> forth in Section 3(e) until such title defects are cured, then promptly
> upon such title defects being cured, at which time Seller may release
> the letter of instruction to the Escrow Agent directing Escrow Agent
> to release the Entire Deposit to Seller.

Ex. F, § 3(f).

Buyers did not materially breach the contract. First, nowhere in the Addendum does it

mention that "time is of the essence." *See* Ex. F. Moreover, Buyers have plead enough facts to

show they worked diligently and ordered the surveys promptly. Sellers own Complaint pleads

that Buyers requested prior surveys in Sellers' possession at least a month prior to closing. Pls.'

Compl. ¶¶ 41-43. Sellers also saw surveyors on the properties on July 7 and 20, 2020,

respectively. *Id*. at ¶¶ 48, 56.

Buyers plead that they had attempted to contract with survey companies "over the

intervening weeks and month" since the Parties signed the Addendum but were told that the

companies were not fully open yet because of the government lockdowns or a significant

backlog of work.[12] Defs.' Countercl. ¶ 41. The Addendum, which Sellers signed, acknowledged

that all conditions precedent and Buyers' diligence were "deemed satisfied as of the date of this

Addendum." Ex. F, at 1. Thus, Sellers cannot prove, based on the pleadings, that Buyers

materially breached the contract.

Second, the Addendum also allowed the Parties to move the closing date to cure title

defects. Ex. F, at § 3(f). The title company, based on the surveys, noted several deficiencies with

---

[12] Some title companies informed Buyers that they had a backlog of five weeks or more. Defs.' Countercl. ¶ 41.

Sellers' Bucks County title. Defs.' Countercl. ¶ 46. On August 3, 2020, Buyers invoked § 3(f) of the Addendum and notified Sellers of documents they needed to correct the title defects and that closing would be delayed for up to three business days. *Id*. at ¶ 49. These actions were well within Buyers' right under the Addendum's terms.

Third, this Court agrees with Buyers' argument that attaching "time is of the essence" language to the Addendum would make the contract unworkable. The Addendum's "Additional Delay(s)" provision, § 3(f), allows the Parties a workable and flexible schedule to complete the closing, around the unpredictive nature of the pandemic and government lockdowns. Sellers' argument would impose a strict and rigid schedule to complete the transaction which is simply not applicable under the Addendum's language nor its intent. *See Ronnen v. Ajax Elec. Motor Corp.*, 671 N.E.2d 534, 536 (N.Y. 1996) ("We have long and consistently ruled against any construction which would render a contractual provision meaningless or without force of effect").

Finally, Sellers were not allowed to terminate the transaction. As stated above, the Addendum provided an Additional Delay provision. Buyers invoked this provision which foreclosed Sellers' ability to terminate the contract. Buyers attempted to cure the title defects as was required under the Addendum, but Sellers attempted to have the escrow agent release the funds. Thus, because Buyers did not materially breach the contract, based on their pleadings, and because "time is of the essence" was not included in the Addendum, Sellers are not entitled to Declaratory Judgment.

### B.  Whether Buyers' Counterclaim is Proper

Buyers bring forth a counterclaim for breach of contract. Sellers, however, asks this Court to dismiss Buyers' Counterclaim because: (1) Buyers did not timely identify any title

defects; and (2) Buyers do not contend they tendered the purchase price on the extended Real Estate Closing date. Pls.' Br. at 14. Sellers assert Buyers failed to promptly order surveys and only claimed title defects on August 3, 2020, 13 days after the July 21, 2020 deadline.[13] Pls.' Br. at 15 (citing Ex. F). In the alternative, Sellers argue that even if Buyers had timely objected, Buyers were still required to tender the purchase price and demand Sellers to cure the purported defects to demand specific performance. *Id*. at 18.

### i.   Identification of Title Defects

This Court disagrees with Sellers and finds that Buyers' Counterclaim pleads enough facts to survive dismissal at this point. First, the pandemic severely limited Buyers' ability to perform and complete their obligations prior to closing. Pennsylvania and New York issued shutdowns on government offices and non-essential businesses. Section 3(e) of the Addendum stated, in pertinent part, "except that if real estate surveys are promptly ordered, but not completed due to no fault of buyer, period for identification of title defects extended for at least three (3) business days after delivery of the Surveys (and closing is extended accordingly)." Pls.' Compl., Ex. F, §3(e). When the state governments lifted their lockdowns, Buyers attempted to find vendors to perform the required survey work. This proved to be difficult as many businesses suffered from a five-week backlog due to the initial government shutdowns. Buyers attempted to complete the surveys prior to closing and secured vendors by June 30, 2020, a month prior to closing, to perform the required survey work. Thus, Buyers acted reasonably and promptly, within the circumstances of the ongoing pandemic.

Second, Sellers were aware of title defects, prior to the August 3, 2020 letter. Both Buyers' Counterclaim and Sellers' Complaint contradict Sellers' argument. The Parties plead

---

[13] The Addendum states that the real estate transaction's closing date was set to occur on July 31, 2020. Ex. F, § 2.

that Legacy Title contacted Sellers about title document defects on or before July 29, 2020.[14]

Pls.' Compl. ¶¶ 58-59; Defs.' Countercl. at ¶ 44. Moreover, Legacy Title generated a new

invoice for the New York real estate closing on July 31, 2020 at 2:35 p.m., before the close of

business; that document did not reflect the correct recording tax. Pls.' Compl. ¶ 66. Thus, Sellers

were aware of issues surrounding the title documents and their argument that Buyers failed to

timely object lacks merit.

### ii.   The Parties' Duties, Rights, and Tendering the Purchase Price

Sellers contend that even if Buyers had timely objected, their counterclaim should be

dismissed because they did not tender the purchase price on the Extended Real Estate Closing

Deadline. Pls.' Br. at 18. Sellers further argues that Buyers' contention that Sellers failed to

deliver a certificate of occupancy and zoning compliance letter is insufficient to excuse Buyers'

breach or support their Counterclaim. *Id*. Finally, they assert that Buyers have no right to demand

specific performance because there is no default by Sellers. *Id*.

Sellers' second argument also lacks merit. First, Sellers plead that they tendered the

purchase price. Defs.' Countercl., Ex. 1 at 2. Attached to Buyers' Counterclaim as Exhibit 1 is

their August 3, 2020 letter in which they inform Seller that they have "provided all required

closing documents, transmitted all funds due from Buyer[s] to the Title Company, and, with the

delivery of this letter, satisfied all of its obligations under the APA and PSA that are required…"

*Id*.

Additionally, Sellers' assertion that Buyers were not entitled to missing documents is

flawed.  As an initial matter, the contract placed a duty on Buyers to provide any documents that

are "reasonably required…or may be requested by the Title Company." APA, § 10(a)(viii).

---

[14] Buyers plead Sellers knew of the defects on July 29, 2020. Defs.' Countercl. at ¶ 44.

Section 3(e) of the Addendum also required receipt of certificates of occupancy and zoning compliance/building code violation letters. *See* Ex. F, § 3(e). However, many of these documents were in Sellers' possession.  Sellers cannot assert that Buyers failed to meet their duty at closing while also possessing documents that Buyers requested and refusing their request. Thus, Sellers' request to dismiss Buyers' Counterclaim is dismissed as Buyers have plead enough facts to survive dismissal.

      **C.  The *Lis Pendens* Issue**

Sellers request that this Court strike the *lis pendens* Buyers placed on the property because Buyers do not have a contractual interest in the property. Pls.' Br. at 22. However, for the reasons stated above, Buyers still have a contractual interest in the property. Striking the *lis pendens* at this time would be pre-mature; thus, Sellers' request is denied.

**IV.**    <u>**CONCLUSION**</u>

For the reasons stated above, judgment on the pleadings is denied.  A corresponding order will be entered.