**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DONOVAN REALTY, LLC, DD&A TILDEN REALTY, LLC, ZERTECK, INC., TILDEN RECREATIONAL VEHICLES, INC., and DERWOOD L. LITTLEFIELD, | : : : : : | |
| Plaintiffs/Counterclaim-Defendants, | : : | Case No. 2:20-cv-03954-CMR |
| v. | : : | |
| CAMPERS INN HOLDING CORPORATION, CI OF HAMBURG, LLC, and CI OF WEST COXSACKIE, LLC, | : : : : : | |
| Defendants/Counterclaim-Plaintiffs, | : : | |

**DEFENDANTS/COUNTERCLAIM-PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and this Court's Order, dated March 17,

2022 (ECF NO. 62), Defendants/Counterclaim-Plaintiffs Campers Inn Holding Corporation, CI of

Hamburg, LLC, and CI of West Coxsackie, LLC (collectively, "Campers Inn") respectfully move

for summary judgment in their favor on (a) Campers Inn's breach of contract counterclaim against

Plaintiffs/Counterclaim-Defendants Donovan Realty, LLC, DD&A Tilden Realty, LLC, Zerteck,

Inc., Tilden Recreational Vehicles, Inc., and Derwood L. Littlefield (collectively, "BNRV") and

(b) BNRV's claims against Campers Inn. As grounds for this motion, Campers Inn relies on and

incorporates herein their supporting Memorandum of Law and all exhibits thereto, all of which are

submitted herewith.

WHEREFORE, Campers Inn respectfully requests that the Court issue an Order granting

summary judgment in Campers Inn's favor and against BNRV.

Dated: April 28, 2022

Respectfully submitted,

**BLANK ROME LLP**

 */s/ James T. Smith*
James T. Smith
William R. Cruse
Danielle Catalan
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Telephone:    (215) 569-5500
Facsimile:    (215) 569-5555

*Attorneys for Defendants/Counterclaim-Plaintiffs Campers Inn Holding Corporation, CI of Hamburg, LLC and CI of West Coxsackie, LLC*

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| DONOVAN REALTY, LLC, DD&A TILDEN REALTY, LLC, ZERTECK, INC., TILDEN RECREATIONAL VEHICLES, INC., and DERWOOD L. LITTLEFIELD, | : : : : : : | |
| Plaintiffs/Counterclaim-Defendants, | : : | Case No. 2:20-cv-03954-CMR |
| v. | : : : | |
| CAMPERS INN HOLDING CORPORATION, CI OF HAMBURG, LLC, and CI OF WEST COXSACKIE, LLC, | : : : : : | |
| Defendants/Counterclaim-Plaintiffs, | : : | |

## DEFENDANTS/COUNTERCLAIM-PLAINTIFFS'
## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

BLANK ROME LLP

James T. Smith, Esq.
William R. Cruse, Esq.
Danielle Catalan, Esq.
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Telephone: (215) 569-5500
Jim.Smith@BlankRome.com
William.Cruse@BlankRome.com
Danielle.Catalan@BlankRome.com

*Counsel for Defendants/Counterclaim-Plaintiffs*
*Campers Inn Holding Corp., CI of Hamburg, LLC,*
*and CI of West Coxsackie, LLC*

**TABLE OF CONTENTS**

**Page:**

I.    INTRODUCTION. ..................................................................................................1

II.   STATEMENT OF FACTS. ....................................................................................2

      A.    Campers Inn and BNRV Agree to the Purchase and Sale of BNRV's
            Properties and Dealerships in New York and Pennsylvania....................2

      B.    Campers Inn and BNRV Execute Asset and Real Estate Purchase
            Agreements on February 4, 2020............................................................4

      C.    The Onset of the COVID-19 Pandemic Impedes The Transactions from
            Moving Forward as Planned. ...................................................................8

      D.    The Parties Renegotiate the Transaction Agreements so as to Proceed with
            the Transactions in the New COVID-19 Environment..............................9

      E.    The Market for Recreational Vehicles Surges Back in June 2020. .......11

      F.    Campers Inn Orders and Completes Surveys of the Properties Before
            Friday, July 31, 2020. ..........................................................................12

      G.    Campers Inn Completes Loan Documentation and Requirements Before
            Friday, July 31, 2020. ..........................................................................14

      H.    The Parties Work Toward Closing on Friday, July 31, 2020. ...............14

      I.    Campers Inn and M&T Bank Continue to Work Over the Weekend
            Toward Funding on Monday, August 3, 2020.......................................20

      J.    Unbeknown to Campers Inn, BNRV Decides on Friday July 31, 2020 Not
            to Proceed to Closing............................................................................20

      K.    Unbeknown to Campers Inn, BNRV Executes Strategy to Sell the
            Properties and Dealerships to Camping World for an Additional $1.5
            Million...................................................................................................24

III.  THE LEGAL STANDARD FOR SUMMARY JUDGMENT........................29

IV.   THE UNDISPUTED FACTS ESTABLISH THAT BNRV IS LIABLE FOR
      BREACH OF CONTRACT....................................................................................30

      A.    Campers Inn Performed Its Pre-Closing Obligations. ..........................30

      B.    BNRV Materially Breached the Transaction Agreements in Multiple
            Ways. ....................................................................................................32

      C.    Campers Inn's Injury – Its Loss of the Properties and Dealerships – Is
            Indisputable...........................................................................................35

      D.    BNRV's Arguments that "Time Was of the Essence" to Closing By 5:00
            PM on Friday, July 31, 2020 and that the Transaction Agreements "Self-
            Terminated" at that Time Are Fallacious and Wrong.............................35

V.    CAMPERS INN IS ENTITLED TO A PERMANENT INJUNCTION
      ORDERING SPECIFIC PERFORMANCE OF THE TRANSACTION
      AGREEMENTS AND TRANSFER OF THE PROPERTIES AND
      DEALERSHIPS TO CAMPERS INN..................................................................................38

      A.    Campers Inn Is Contractually Entitled to a Permanent Injunction Ordering
            Specific Performance. .......................................................................................38

      B.    Campers Inn Is Otherwise Legally Entitled to a Permanent Injunction
            Ordering Specific Performance..........................................................................39

      C.    BNRV's Unlawful and Deceptive Double-Dealing of The Properties and
            Dealerships Can, and Must Be, Unwound. .........................................................42

VI.   CAMPERS INN IS ENTITLED TO SUMMARY JUDGMENT ON BNRV'S
      CLAIMS. ...............................................................................................................45

      A.    The Undisputed Facts Show That Campers Inn Did Not Breach the
            Transaction Agreements. ...................................................................................45

      B.    Campers Inn Is Entitled to Summary Judgment on BNRV's Alternative
            Claim for Declaratory Judgment (Count II)..........................................................49

      C.    Campers Inn Is Entitled to Summary Judgment on BNRV's Alternative
            Claim for Promissory Estoppel (Count III). ........................................................50

VII.  CONCLUSION.......................................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABI Jaoudi and Azar Trading Corp. v. CIGNA Worldwide Ins. Co.*,
  2016 WL 3959078 (E.D. Pa. July 22, 2016)...............................................................................45

*ACLU, et al. v. Mukasey*,
  534 F.3d 181 (3d Cir. 2008).....................................................................................................36

*Allegheny Energy, Inc. v. DQE, Inc.*,
  171 F.3d 153 (3d Cir. 1999)................................................................................................39, 41

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..................................................................................................................30

*Autotech Techs. LP v. Integral Research & Dev. Corp.*,
  499 F.3d 737 (7th Cir. 2007) ...................................................................................................45

*Braverman Kaskey, P.C. v. Toidze*,
  2013 WL 6095679 (E.D. Pa. Nov. 19, 2013) ...........................................................................36

*Burkhart v. George*,
  228 A.D.2d 536 (N.Y. App. Div. [2nd Dep't] 1996)................................................................43

*Carlson v. Arnot-Ogden Mem. Hosp.*,
  918 F.2d 411 (3d Cir. 1990).....................................................................................................50

*Carpenter Tech. Corp. v. City of Bridgeport*,
  180 F.3d 93 (2d Cir.1999).........................................................................................................35

*Clark v. Pennsylvania State Police*,
  436 A.2d 1383 (Pa. 1981).........................................................................................................39

*Cottman Transmission Systems, LLC v. Gano*,
  2103 WL 842709 (E.D. Pa. Mar. 7, 2013)................................................................................41

*East Tenn. Natural Gas Co. v. Sage*,
  361 F.3d 808 (4th Cir. 2004) ...................................................................................................35

*Fallati v. Mackey*,
  31 A.D.3d 879 (N.Y. App. Div. [3d Dep't] 2006)....................................................................39

*Frankel v. Ne. Land Co.*,
  570 A.2d 1065 (Pa. Super. 1990)..............................................................................................43

*Gambone v. Lite Rock Drywall*,
   288 Fed.Appx. 9 (3d Cir. 2008)...........................................................................44

*Gas Natural, Inc. v. Iberdrola, S.A.*,
   33 F. Supp. 3d 373 (S.D.N.Y. 2014).....................................................................50

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*,
   549 F.3d 1079 (7th Cir.2008) ...............................................................................35

*Golden State Bottling Co. v. N.L.R.B.*,
   414 U.S. 168 (1973)...............................................................................................45

*Harsco Corp. v. Segui*,
   91 F.3d 337 (2d Cir. 1996).....................................................................................30

*In re Linerboard Antitrust Litig.*,
   361 Fed.Appx. 392 (3d Cir. 2010).........................................................................45

*K–Mart Corp. v. Oriental Plaza, Inc.*,
   875 F.2d 907 (1st Cir.1989)...................................................................................35

*Kerr-McGee Chemical Corp. v. City of West Chicago*,
   732 F. Supp. 922 (N.D. Ill. 1990) .........................................................................42

*Kohl v. PNC Bank Nat'l Ass'n*,
   912 A.2d 237 (Pa. 2006) ........................................................................................43

*Lockheed Martin Corp. v. Retail Holdings, N.V.*,
   639 F.3d 63 (2d Cir. 2011)......................................................................................36

*Long John Silvers, Inc. v. Fiore*,
   386 A.2d 569 (Pa. Super. 1978)..............................................................................43

*Minard Run Oil Co. v. United States Forrest Serv.*,
   670 F.3d 236 (3d Cir. 2011), *as amended* (Mar. 7, 2012) ....................................35

*Morrocoy Marina, Inc. v. Altengarten*,
   120 A.D.2d 500 (N.Y. App. Div. [2nd Dep't.] 1986)............................................43

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm.
   Co.*,
   290 F.3d 578 (3d Cir. 2002)....................................................................................42

*Oliver v. Ball*,
   136 A.3d 162 (Pa. Super. 2016)..............................................................................40

*Payne v. Clark*,
   197 A.2d 769 (Pa. 1963) .........................................................................................40

*Rabin v. Mony Life Ins.*,
    2007 WL 737474 (S.D.N.Y. Mar. 8, 2007) ...................................................................30

*Radiant Realty Co. v. Sheinbaum*,
    171 N.Y.S.2d 252 (NY Sup. Ct. 1958) ......................................................................40

*Ronnen v. Ajax Elec. Motor Corp.*,
    671 N.E.2d 534 (N.Y. 1996)....................................................................................36

*Russack v. Weinstein*,
    291 A.D.2d 439 (NY 2002) .....................................................................................36

*S. Rd. Assocs., LLC v. IBM*,
    4 N.Y.3d 272 (2005) ...............................................................................................36

*Shields v. Zuccarini*,
    254 F.3d 476 (3d Cir. 2001)....................................................................................39

*Singh v. Carrington*,
    18 A.D.3d 855 (N.Y. App. Div. 2005) .....................................................................37

*State Auto Ins. Co. v. Summy*,
    234 F.3d 131 (3d Cir. 2000)....................................................................................49

*Step-Saver Data Sys., v. Wyse Tech.*,
    912 F.2d 643 (3d Cir. 1990)....................................................................................49

*URL Pharma, Inc. v. Reckitt Benckiser, Inc.*,
    2016 WL 1592695 (E.D. Pa. Apr. 20, 2016) ...........................................................42

*Willoughby Rehab. v. Webster*,
    134 A.D.3d 811 (NY 2015) .....................................................................................37

*Wonderland Shopping Ctr. Venture Ltd. P'ship v. CDC Mortg. Capital, Inc.*,
    274 F.3d 1085 (6th Cir.2001) .................................................................................35

**Statutes**

28 U.S.C. § 1651(a) .......................................................................................................45

**Other Authorities**

Fed. R. Civ. P. 56(c) ......................................................................................................30

Fed. R. Civ. P. 65..........................................................................................................44

N.Y. C.P.L.R. 6501........................................................................................................43

Restatement (Second) of Contracts § 360 cmt. (e) .........................................................40

I.    **<u>INTRODUCTION.</u>**[1]

This is a straightforward case of double-dealing by BNRV of its recreational vehicle dealerships and associated real estate in Greene County, New York and Berks County, Pennsylvania. Application of the law and the parties' contracts to the following undisputed, essential facts shows that BNRV materially breached the transaction agreements and, accordingly, that Campers Inn is entitled to summary judgment on its breach of contract claim:

- On February 4, 2020, BNRV and Campers Inn entered into agreements for the sale and purchase of the properties and dealerships, which they scheduled to close on April 15, 2020.

- In the weeks that followed, the COVID-19 pandemic erupted, disrupting the recreational vehicle market as a whole as well as the parties' ability to proceed with the transactions. The parties ultimately agreed to amend their agreements, in which BNRV accepted a price reduction and agreed to postpone the closing of the real estate transactions to July 31, 2020 and the closing of the asset transactions to September 30, 2020 to address the uncertainties wrought by the COVID-19 pandemic.

- In the week before the planned closing of the real estate transactions, BNRV communicated with Campers Inn's larger, direct competitor, Camping World, about selling the properties and dealerships to them instead of Campers Inn, in direct violation of BNRV's "No Shop" commitment to Campers Inn.

- Closing of the real estate transactions on Friday, July 31, 2020 was interrupted when the buy-side and sell-side bank, M&T Bank, closed its wire-funding window at 2:00 p.m. that day, which impeded both parties' abilities to complete their closing obligations. At the end of the day, Campers Inn had tendered all of its closing documents and had obtained the bank's commitment to fund the acquisition loans the next business day. Unbeknown to Campers Inn, BNRV had decided that afternoon not to send any of its closing documents to the escrow/closing agent and not to proceed any further with Campers Inn.

- Further unbeknown to Campers Inn, over the weekend of Saturday and Sunday, August 1 and 2, 2020, BNRV met with the leading executives of Camping World and agreed to sell Camping World the properties and dealerships for $1.5 million more than BNRV was to receive from Campers Inn. BNRV then sued Campers Inn for breach based on allegations of wrongdoing never raised during the parties prior dealings, all in an effort to take Campers Inn's $750,000 in earnest money in addition to the $1.5 million higher purchase price from Camping World.

- BNRV and Camping World closed their transactions for the same properties and dealerships while Campers Inn's counterclaim and motion for preliminary injunction seeking specific

---

[1] Attached hereto as **Exhibit D88** is a glossary of capitalized terms as used herein.

1

performance were pending before this Court and after Campers Inn had attached *lis pendens* to the properties.

In stark contrast to Campers Inn's case for entry of summary judgment, BNRV's arguments are convoluted, fallacious, and wrong. BNRV seeks to justify its unlawful double-dealing by claiming that closing by 5:00 p.m. on Friday, July 31, 2020 was "of the essence" to the parties' agreements and that the agreements "self-terminated" at that time. Neither of these legal arguments is supported by a plain reading of the parties' agreements, as this Court has already decided. BNRV's claims that Campers Inn breached the agreements by failing to "promptly" obtain surveys, title work or other closing documentation are also convoluted, fallacious, and wrong. It is undisputed that Campers Inn completed all of these tasks before July 31, 2020, and that BNRV never complained about the timing of any of these events until it filed this lawsuit. BNRV's arguments are merely trumped-up concoctions developed *post hac*, lacking any substance in the facts, the agreements, or the law.

Stripped of BNRV's white noise, the essential, undisputed facts show that BNRV willfully breached its agreements with Campers Inn in order to get more money from Camping World for the same properties and dealerships. Campers Inn is therefore entitled to summary judgment in its favor and issuance of a permanent injunction compelling conveyance of the properties and dealerships to Campers Inn.

## II.   STATEMENT OF FACTS.

### A.   Campers Inn and BNRV Agree to the Purchase and Sale of BNRV's Properties and Dealerships in New York and Pennsylvania.

Littlefield owns and operates recreational vehicle ("RV") dealerships trading under the "Boat N RV" brand as well as other businesses, including boat manufacturing, vehicle warranty reinsurance, and gas station travel centers.[2] In late 2019, Littlefield decided to sell four of his

---

[2] **Exhibit D89,** Deposition of Thomas Shields, Vol. I, 39:19-40:16.

dealerships and associated real estate located in Hamburg, Pennsylvania, West Coxsackie, New York, ██████████████████████████████████.[3] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.[4]

Because Littlefield had no prior experience in selling a dealership business and associated real estate, Littlefield and his management team, consisting of COO Geoff Hoffman and General Counsel Thomas Shields, engaged Haig Partners, a known sell-side broker in the RV industry.[5] Littlefield tasked Haig Partners with obtaining appraisals for the four dealerships' real estate and finding potential buyers.[6] Littlefield did not consider the Boat N RV dealership businesses themselves as a draw for potential buyers.[7] Haig Partners obtained appraisals valuing the PA Property at $███████ and the NY Property at $███████, which Haig Partners presented to potential buyers in "Offering Materials" describing the unique attributes of both properties.[8]

Campers Inn was the only bidder for any of the four BNRV properties and Campers Inn was only interested in the NY and PA Properties.[9] To Campers Inn, the value of the opportunity was in the real estate, as Campers Inn did not sell boats and carried different brands of RVs.[10] Based in Jacksonville, Florida, Campers Inn had a network of 27 dealerships primarily in the eastern half of the country and viewed BNRV's New York and Pennsylvania locations as complimentary to Campers Inn's Northeast Region.[11] In January 2020, BNRV and Campers Inn

---

[3] *See* **Exhibit D90,** Deposition of Derwood "Don" Littlefield, Vol. I, 62:13-63:2.
[4] *Id.* at 63:4-7; **Exhibit D91,** Deposition of Geoffrey Hoffman 46:9-48:6.
[5] Littlefield Dep., Vol. I, 64:12-65:20; Hoffman Dep. 49:11-50:19.
[6] Littlefield Dep., Vol. I, 66:1-67:3.
[7] *Id.* 69:3-70:20.
[8] **Exhibit D84** at 9 (summarizing appraisals), 11-15 (describing unique features of PA Property), and 16-19 (describing unique features of NY Property).
[9] Littlefield Dep., Vol. I, 70:21-71:4; Hoffman Dep. 54:9-25.
[10] **Exhibit D92,** Deposition of Jeff Hirsch at 49:5-23.
[11] Hirsch Dep. 24:23-25:9; **Exhibit D93**, Deposition of Matthew Jeppsen 32:13-15. *See also* www.campersinn.com (describing dealership locations).

reached an agreement-in-principle, in which Campers Inn would purchase the NY and PA Properties and certain of BNRV's dealership assets on the properties. Campers Inn agreed to pay BNRV nearly 100 percent of the appraised value of both Properties, as well as $████ in goodwill for the dealership assets.[12] BNRV knew that Campers Inn would be financing the acquisitions with M&T Bank, which also was BNRV's banker that held the mortgage and a related interest-rate swap on BNRV's PA Property.[13]

> **B.    Campers Inn and BNRV Execute Asset and Real Estate Purchase Agreements on February 4, 2020.**

To document the Parties' contemplated transactions, Campers Inn engaged W. Hamilton Traylor of the law firm Fisher Tousey, Leas & Ball in Jacksonville, Florida, a transactional attorney with over 40 years of experience in business acquisitions.[14] BNRV, in turn, was represented in the transactions by its General Counsel, Shields, who also had experience in documenting asset and real estate purchase transactions.[15] Campers Inn and BNRV signed the APA and REPA on February 4, 2020.[16] The provisions of the APA and REPA relevant to the parties' dispute are summarized below.[17]

APA § 1.4 Purchase Price for Properties and Dealerships. The Parties agreed to a total purchase price of $████, consisting of ████ for the PA Property, $████ for the NY Property, and $████ in "goodwill" for the dealerships.[18] The APA required Campers Inn to deposit in escrow $████ upon execution of the APA and an additional $████ upon completion of diligence.[19] At "Closing," as that term is defined in APA § 7.1, the balance of the

---

[12] **Exhibit P-76**; Hirsch Dep. 31:6-8.
[13] Littlefield Dep. Vol. I, 94:3-15, 99:20-100:6; Shields Dep., Vol. II, 104:1-8.
[14] **Exhibit D94,** Deposition of W. Hamilton Traylor, Vol. I, 16:16-17:14; Hirsch Dep. 44:1-4.
[15] Shields Dep., Vol. I, 25:24-26:19, 59:16-60:7.
[16] *See* **Exhibits D6** ("APA"), **D7** ("REPA"), Hirsch Dep. 54:15-56:5 (acknowledging execution of APA and REPA); Littlefield Dep., Vol. I, 89:8-90:16 (same).
[17] The APA and REPA are governed and construed in accordance with New York law. APA § 10.5; REPA § 15(b).
[18] APA § 1.4; Shields Dep., Vol. I, 62:18-64:20.
[19] APA § 1.4(b).

purchase price was to be "delivered to the closing agent"/escrow agent for distribution to the Sellers.[20]

APA §§ 4.1, 4.3 Confidentiality and No Shop. The Parties also agreed to provisions to protect their confidential information and safeguard their investment in the transaction process. In Section 4.1 of the APA, they agreed that "all information obtained from Buyer or Seller in connection with the Transactions" must be "h[e]ld in strict confidence" and "not disclose[d] to any [other] person."[21] And, in Section 4.3, Littlefield, personally, and his companies pledged through "the Closing Date or the termination of this Agreement," to not, directly or indirectly:

> (a) consider, discuss or negotiate with, or solicit, initiate or encourage the transfer or sale of the Business. . . , or (b) . . . divulge or otherwise disclose any material information to any Person other than Buyer regarding any aspects of this Agreement, or matters related thereto, including the Purchase Price, terms, conditions, financing, or status of negotiations and discussions between [BNRV and Campers Inn].[22]

And, if BNRV were to receive "any inquiry, proposal or offer" from another interested party, BNRV was required "to provide [Campers Inn] with notice thereof promptly . . . , including the identity of the prospective purchaser . . . and the terms of any such proposal. . . ."[23] BNRV admits that the Parties included this provision in the APA because "Campers Inn did not want [BNRV] to seek a better offer during the pendency of the contract[.]"[24]

REPA §§ 4-6 Diligence Materials, Status of Title to Property, and Inspection. For the real estate purchase transactions, the parties agreed to provisions governing the pre-closing assessment of the Properties. "[N]ot later than five (5) business days" after February 4, 2020, BNRV was required to deliver to Campers Inn, among other items, "copies of any existing surveys prepared

---

[20] *Id.*
[21] APA § 4.1.
[22] APA § 4.3.
[23] *Id.*
[24] Shields Dep., Vol. I, 75:22-76:1.

by any survey or engineering company . . . as well as any of the most recent title insurance policy or commitment for title insurance" for the Properties.[25] During the 30-day period following execution of the APA, Campers Inn was to obtain a title commitment, inspect the Properties, and identify title defects to BNRV, which BNRV would then have another 30-day period in which to cure any identified defects.[26]

REPA § 9 Escrow Closing.

Under Section 9 of the REPA, the Parties could opt to close the transactions through a "mail away closing or escrow closing" in which each party submits their required closing documents to the title insurer serving as the escrow agent who also receives in escrow the total purchase price. The escrow agent may only release the purchase price to BNRV and the title and deed documentation to the Properties to Campers Inn once each side's closing documents and the purchase money are received in escrow.[27] The parties ultimately agreed to an escrow closing.[28]

APA § 7.2 Deliveries at Closing and REPA § 10 Closing Documents. Section 7.2(a) of the APA identifies BNRV's required deliveries to Campers Inn at closing through the escrow closing process, which include, *inter alia*, possession of the Dealerships and Properties, all required closing documents, and "such other documents as may be reasonably necessary to consummate the Transactions as reasonably requested by [Campers Inn] or its counsel."[29] Section 10 of the REPA identifies the required closing documents for the real estate transactions to be provided by BNRV at closing, including, most importantly, a "Warranty Deed" to each Property.[30] Section

---

[25] REPA §§ 4(a) and 5(b).
[26] *Id.* §§ 5-6.
[27] REPA § 9; Shields Dep., Vol. I, 92:11-94:10 (describing the escrow closing process).
[28] Shields Dep., Vol. I, 92:15-17.
[29] APA § 7.2(a).
[30] REPA § 10; A "Warranty Deed" is defined in Section 5(d) of the REPA as "marketable fee simple title of record to the Land and Improvements to Buyer by a recordable warranty deed (the "***Warranty Deed***"), in a form reasonably acceptable to Buyer and the Title Insurer and consistent with the terms of this Agreement...." REPA § 5(d).

7.2(b) of the APA and Section 10(b) of the REPA identify Campers Inn's deliverables into escrow at closing, which, in addition to various documents, include, principally, the purchase price.[31]

APA § 7.1 Time, Date, and Place of Closing. Section 7.1 of the APA defines the "Closing Date" as "the date on which the Closing actually occurs" and states that "the Closing shall take place on or before April 15, 2020. . . , time being of the essence."[32] But the Parties also agreed that their obligations under the APA could continue after April 15, 2020.[33] Other than wanting to complete the transactions by April 15, 2020, BNRV cannot identify any reason for the April 15, 2020 closing date or any harm (other than a delayed closing) that would befall BNRV from the transactions closing at a later date.[34]

APA § 9.1 Termination. The APA states that the Parties' contractual obligations may only terminate under specifically defined circumstances. Pertinent to this dispute is BNRV's assertion that the Transaction Agreements terminated pursuant to § 9.1 (c), which states:

> This Agreement may be terminated at any time: (c) by any Party if the Closing shall not have occurred by April 15, 2020, and the Party seeking termination is ready, willing and able to close and not in material default[.][35]

APA § 10.7 Specific Performance; Injunctive Relief. The Parties agreed that in the event of breach, "no remedy at law will provide adequate relief" and that the non-breaching party shall be entitled to "specific performance" of the APA and REPA and "temporary and permanent injunctive relief."[36]

---

[31] APA § 7.2(b); REPA § 10(b).
[32] APA § 7.1.
[33] Section 9.1 of the APA contemplates that the APA continues after April 15, 2020. It specifically states: "This Agreement may be terminated at any time: (c) by any Party *if the Closing shall not have occurred by April 15, 2020*, and the Party seeking termination is ready, willing and able to close and not in material default. . . ." APA § 9.1(c) (emphasis added); Traylor Dep., Vol. I, 78:25-21 (describing same).
[34] Shields Dep., Vol. I, 90:3-92:10; Littlefield Dep., Vol. I, 91:24-92:1 ("No, I don't know how they selected the closing date.").
[35] APA § 9.1(c) (emphasis added); Shields Dep., Vol. II, 11:17-12:8 (stating that BNRV purports to have terminated the APA and REPA pursuant to § 9.1(c)), Vol. III, 13:1-10 (admitting that the term "may" as used in § 9.1(c) means permissive rather than mandatory).
[36] APA § 10.7.

C.    **The Onset of the COVID-19 Pandemic Impedes The Transactions from Moving Forward as Planned.**

The COVID-19 pandemic erupted in the weeks following execution of the APA and REPA. By March 11, 2020, the World Health Organization had declared COVID-19 a global pandemic and, on March 13, 2020, President Trump declared COVID-19 a national emergency.[37] Orders from the Governors of Pennsylvania and New York shutting down non-essential government services and businesses issued on March 16 and 20, 2020, respectively.[38] The pandemic and accompanying emergency measures had a devastating impact on the RV industry and the Parties' transactions.

The pandemic caused severe disruption to the RV industry as a whole. Industry publications gathering statistical data over the relevant period show sales to have dropped dramatically in the months of March, April, and May 2020 as compared to the prior year.[39] BNRV's General Counsel, Shields, testified that the pandemic and accompanying government and business shutdowns were "an extraordinary event" that created "a number of unknowns."[40] The early months of the pandemic had a particularly devastating effect on BNRV's business at its PA and NY Dealerships when the dealerships were closed except for service. The table below shows the decline in year-over-year sales at both locations for the months of March and April 2020[41]:

| | **PA Dealership** | | **% Y-o-Y Change** | **NY Dealership** | | **% Y-o-Y Change** |
|---|---|---|---|---|---|---|
| | **2020** | **2019** | | **2020** | **2019** | |
| March | $ ████████ | $ ████████ | ██████ | $ ████████ | $ ████████ | ██████ |
| April | $ ████ | $ ████ | ██████ | $ ████ | $ ████ | ██████ |

---

[37] *See* CDC Museum COVID-19 Timeline https://www.cdc.gov/museum/timeline/covid19.html.

[38] *See* BNRV's Answer to Counterclaim (ECF No. 13) ¶¶ 21-22 (admitting same). The Pennsylvania stay-at-home order was in full force and effect through June 5, 2020 and New York's stay-at-home order was in place through June 3, 2020.

[39] *See* **Ex. P-61** at 7 and 8 of 24, **Ex. P-62** at 7-11 of 42; Jeppsen Dep. 292:14-17, 292:24-293:1 (discussing same); Hirsch Dep. 123:25-124:23 (discussing same).

[40] Shields Dep., Vol. I, 104:11-15; Shields Dep., Vol. II, 20:2-9.

[41] *See* **Exhibit D78** (financial statements for PA Dealership Jan.-June 2020); **Exhibit D79** (financial statements for NY Dealership Jan.-June 2020); **Exhibit D79A** (revenue summary of Exs. D78 and D79).

With the shutting down of nonessential government offices and businesses, closing of the transactions by April 15, 2020 became impossible. For example, because of the closure of government offices, the parties could not obtain title information from them, receive required certifications from them, or record instruments of transfer and related documents with them.[42] Moreover, Campers Inn could not obtain the surveys required to close the transactions by April 15, 2020 because surveyors were also shutdown.[43] In sum, the onset of the pandemic and associated shutdown orders issued to protect public health frustrated the parties' ability to close the transactions by April 15, 2020.

## D.    The Parties Renegotiate the Transaction Agreements so as to Proceed with the Transactions in the New COVID-19 Environment.

Campers Inn informed BNRV in late March 2020 that the pandemic and accompanying shutdowns of government and business activity rendered difficult, if not impossible, performance of pre-closing obligations.[44] Campers Inn further advised BNRV that the economic collapse brought about by the pandemic diminished the value of the NY and PA Dealerships and Properties, leading Campers Inn to conclude that BNRV must either agree to a price reduction or Campers Inn would have to exercise its right to terminate the contemplated transactions.[45] Rather than seek new buyers for their Dealerships and Properties or engage in litigation with Campers Inn, BNRV agreed to Campers Inn's demand for a price concession and other amendments to the APA and

---

[42] *See* Traylor Dep., Vol. I, 163:12-165:1 (testifying about effects of closures); Hirsch Dep. 135:22-136:24 (same).

[43] Traylor Dep., Vol. I, 60:2-23 (testifying to the status of Campers Inn's search for surveyor in March-April 2020); **Exhibit D95,** Deposition of Cindy Hogan of Berks Surveying & Engineering, Inc., 12:13-13:11 (testifying that surveyors in Pennsylvania were shutdown from March 17, 2020 through May 5, 2020). *Compare* Shields Dep., Vol. I, 126:12-127:21 (admitting that BNRV never attempted to contact surveyors and has no knowledge of the status of their operations), Vol. II, 81:9-23 (admitting that BNRV has no knowledge of the status of the opening of state government offices in New York and Pennsylvania other than the offices of motor vehicle registration), Vol. II, 79:15-80:24 (admitting that the government offices in Greene County, New York were only open one day a week as late as June 26, 2020); Littlefield Dep., Vol. I, 196:12-197:20 (admitting to knowing nothing about the issuance of stay-at-home orders in Pennsylvania and New York or their effect on government operations).

[44] **Exhibit D10,** Counterclaim ¶ 26; Hirsch Dep. 119:15-120:4; Hoffman Dep. 73:7-21.

[45] Ex. D10, Counterclaim ¶¶ 27-28l Hirsch Dep. 131:12-22; Hoffman Dep. 73:7-21, 76:3-7.

REPA.[46]

Campers Inn and BNRV documented their amendments to the APA and REPA in the Addendum executed on April 24, 2020.[47] The Addendum addresses three issues: (a) a reduction in the total purchase price; (b) an increase in the escrow deposit; and (c) adjustments to the timing of closing and the parties' pre-closing obligations.[48]

The Parties agreed to a price reduction of $████████, which reduced the total purchase price to be paid to BNRV at closing to $████████.[49] BNRV's General Counsel Shields described the reduction in purchase price as:

> [W]hat it was going to take to get the deal done in the current economics of the situation. . . . People were still in the information gathering phase of the COVID-19 pandemic, how it was going to impact the ability to do business going forward. . . . Pennsylvania and New York were closed. Those dealerships – I believe those dealerships were physically closed at the time.[50]

With respect to the escrow deposit, the parties ultimately agreed that Campers Inn would deposit an additional $500,000, bringing the total deposit to $750,000.[51] BNRV wanted this additional deposit so that Campers Inn would have "more skin in the game."[52]

With respect to the timing of the closing of the transactions and completion of pre-closing obligations, the parties agreed in the Addendum to "a workable and flexible schedule to complete the closing around the unpredictive nature of the pandemic and government lockdowns."[53] Rather than a unitary closing date for both the asset and real estate purchase transactions like in Section 7.1 of the APA, the parties agreed in the Addendum that the real estate transactions would close

---

[46] **Exhibit D18,** Response to Interrog. No. 4; Hoffman Dep. 79:4-81:23.
[47] **Exhibit D8** ("Addendum").
[48] *See id.* ¶¶ 2-3.
[49] *Id.* ¶ 3(b).
[50] Shields Dep., Vol. I, 108:19-109:17.
[51] Addendum ¶ 3(a).
[52] Shields Dep., Vol. II, 29:12-23.
[53] Court Memorandum (ECF No. 47) at 17.

"on or before 5:00 p.m. on Friday, July 31, 2020" and the asset purchase transactions would close "on or before 5:00 p.m. on Wednesday, September 30, 2020."[54] The Addendum also provided a mechanism to postpone closing to allow for identification and curing of title defects if surveys of the properties are delayed:

> [E]xcept that if real estate surveys are promptly ordered, but not completed due to no fault of buyer, period for identification of title defects extended for at least three (3) business days after delivery of the Surveys (and closing is extended accordingly). . . . If, however, such items are not obtained on or prior to the Closing Date, then closing shall be delayed until such time as such items are received from the identified vendor(s).[55]

Finally, unlike the APA, nowhere in the Addendum does it state that "time is of the essence" to the new postponed and staggered closing dates of the real estate and asset purchase transactions. Indeed, Campers Inn struck such language from earlier drafts and insisted on its exclusion from the Addendum because of the uncertainties the pandemic posed toward closing the transactions by any rigid deadline.[56]

### E.     The Market for Recreational Vehicles Surges Back in June 2020.

The ongoing pandemic and accompanying stay-at-home orders and limitations on air travel resulted in a surge in demand for RVs starting in or around June 2020. BNRV describes this surge as "the best RV and marine markets in recent years."[57] This huge increase in demand is

---

[54] Addendum § 2. Like the April 15, 2020 unitary closing date in the APA, BNRV cannot identify any importance to the July 31, 2020 closing date for the real estate transactions in the Addendum other than "that's what the parties agreed." Shields Dep., Vol. II, 216:25-217:8.

[55] *Id.* § 3(e). Section 3(f) ("Additional Delays") of the Addendum further contemplates closing of the real estate transactions after July 31, 2020, stating that "if the Closing is postponed to a date past July 31, 2020, due to title defects" the Seller is to release the escrow instruction letter therein after the title defects are cured. Addendum § 3(f).

[56] Traylor Dep., Vol. I, 258:10-22 ("Q: Did you specifically discuss the striking of the 'time is of the essence' language with Mr. Shields? A: Yes. Q: Okay. What was said? A: What was said? He was asking why did you strike time of the essence, and I explained to him I could not agree to have time of the essence when there were uncertainties that were involved at this point in time because we were unsure of when we would be able to obtain things at that point."); **Exhibits D26 and D27** (emails between deal counsel in which 'time is of the essence' was struck from earlier drafts of the Addendum).

[57] **Exhibit D18** at 9; Littlefield Dep., Vol. I, 200:3-14 (describing sales in May 2020 as "good" and sales in June 2020 as "very good" and "up from the year before").

documented in industry publications.[58] As the market for recreational vehicles improved in the weeks and months following execution of the Addendum, BNRV came to regret agreeing to the $█████ price reduction, complaining among themselves that Campers Inn "took undue advantage of the circumstances . . . [b]y blaming the COVID shutdowns for a ten percent price reduction."[59]

F.      Campers Inn Orders and Completes Surveys of the Properties Before Friday, July 31, 2020.

The REPA obligated BNRV to provide any existing surveys of the Properties to Campers Inn "not later than five (5) days" after February 4, 2020.[60] BNRV and Campers Inn knew prior surveys existed from BNRV's prior financings of the Properties and that the existing surveys would "expedite[] the diligence process" and reduce the cost and work to be done in conducting updated surveys of the properties.[61] Moreover, M&T Bank, the very bank that was to finance Campers Inn's acquisition of the Properties, financed BNRV's Properties and approved the existing surveys.[62] Starting from February 4, 2020 through the next several months, Campers Inn repeatedly requested the prior surveys from BNRV. In response, BNRV said they could not find them, but would continue to look for them or that the prior surveys might be in M&T Bank's files.[63] Even though BNRV had personnel on the ground at the Properties who could obtain the existing surveys from the townships, BNRV did not do so because, in their view, they were not "required to."[64] Ultimately, BNRV did not produce the existing survey of the PA Property until

---

[58] *See* **Ex. P-61** at 7 and 8 of 24, **Ex. P-62** at 7-11 of 42.

[59] Hoffman Dep. 86:21-87:5. *See also* Shields Dep., Vol. II, 23:1-4 ("Nobody would be happy about getting a million dollars less for the same thing they agreed to receive more than a million dollars for the previous time.").

[60] REPA §§ 4(a), 5(b).

[61] Shields Dep., Vol. I, 85:6-19; *see* Traylor Dep., Vol. I, 111:13-112:1, 116:23-117:9 (explaining value of existing surveys to expediting diligence). *See also* Hogan Dep. 16:2-17:23 (a surveyor testifying that having existing surveys expedites new surveys of the same property).

[62] *Id.*

[63] Traylor Dep., Vol. I, 112:11-114:20.

[64] Shields Dep., Vol. II, 74:19-76:4.

12

June 26, 2020 and until July 2, 2020 for the NY Property.[65]

With the lifting of stay-at-home orders in early June 2020, Campers Inn turned to the task of obtaining new surveys of the Properties, even though it still lacked the existing surveys.[66] In the opinion of both BNRV and Campers Inn, there was more than enough time to timely complete the surveys. Indeed, BNRV's CEO Littlefield testified that surveys of the Properties should take "less than a week."[67] On June 22, 2020, Campers Inn and M&T Bank reached agreement on the exact scope of the surveys necessary to obtain financing.[68] Thereafter, Campers Inn reached out to several surveyors in the two geographies who could be located through Google searches.[69] Many of the surveyors Campers Inn contacted failed to respond to Campers Inn and others submitted bids Campers Inn deemed excessive.[70] Rather than engage an unknown surveyor, Campers Inn sought a recommendation from a civil engineer with whom it had done business for over a decade, who referred Campers Inn to Berks Surveying and Engineering for the PA Property and Sardo Land Surveying for the NY Property.[71] Campers Inn "promptly ordered" surveys from both companies on July 1, 2020 and instructed both to complete work before July 31, 2020.[72]

It is undisputed that the surveyors were working on the Properties by July 7, 2020 and that the surveys were completed during the week of closing and before July 31, 2020.[73] It is also

---

[65] **Exhibit D30** (email delivery of existing survey of PA Property); Shields Dep., Vol. II, 79:20-80:24 (discussing same); **Exhibit D24** (email delivery of existing survey of NY Property); Hoffman Dep. 112:25-113:9 (discussing same).

[66] The Pennsylvania stay-at-home order was in full force and effect through June 5, 2020 and New York's stay-at-home order was in place through June 3, 2020.

[67] Littlefield Dep., Vol. I, 224:6-8 ("In the sizes of those two pieces of property, around 20 acres. A surveyor should be able to do a survey there in less than a week."); Traylor Dep., Vol. I, 310:17-24 (stating 30 days is a reasonable amount of time for the surveys).

[68] **Exhibit P-24**; Traylor Dep., Vol. I, 298:11-299:18.

[69] Traylor Dep., Vol. I, 300:19-301:2, 303:12-304:2.

[70] Traylor Dep., Vol. I, 302:17-303:11.

[71] Traylor Dep., Vol. I, 303:4-11; Hirsch Dep. 152:12-153:24, 155:7-155:22.

[72] Addendum § 3(e) ("promptly ordered"); **Exhibit D34** (Contract with Sardo Land Surveying); **Exhibit D35** (Contract with Berks Land Surveying); Hogan Dep. 17:24-19:23 (Berks's Hogan testifying that they knew to be done in less than 30 days).

[73] Complaint (ECF No. 1) ¶ 48; Shields Dep., Vol. II, 78:9-79:14. The final surveys were delivered on July 28, 2020. *See* **Exhibit D40** (PA Property survey), **Exhibit D42** (NY Property survey); Jeppsen Dep. 266:24-267:12, 269:8-25 (testifying to delivery of both surveys on July 28, 2020).

undisputed that the surveyors and title insurers engaged by Campers Inn were identified to BNRV by Friday, July 24, 2020 and that BNRV had in hand all title commitment work by Monday, July 27, 2020.[74] BNRV never complained about the timing of the performance of the surveys or production of title commitments until it filed this lawsuit on August 13, 2020. Even then, BNRV concedes it suffered no harm from the timing of either.[75]

### G.   Campers Inn Completes Loan Documentation and Requirements Before Friday, July 31, 2020.

In early March 2020, M&T Bank approved loan commitments to Campers Inn for the acquisition of the Properties that would remain open through the end of August 2020.[76] As of July 28, 2020, Campers Inn had provided all documentation and other items M&T Bank required to close the loan transactions.[77] Some items, however, were to be provided after closing pursuant to a Post-Closing Agreement.[78] What remained to be done for closing of the real estate transactions was for Campers Inn and BNRV to execute and tender to the escrow agent the closing deliverables identified in the APA and REPA, as amended by the Addendum.

### H.   The Parties Work Toward Closing on Friday, July 31, 2020.

The record developed in discovery shows that the parties worked diligently toward closing the real estate transactions by close of business on Friday, July 31, 2020, until Littlefield made the unilateral decision on Friday afternoon not to send to the escrow agent *any* of BNRV's closing documents required under the Transaction Agreements.

---

[74] **Exhibit P-209** (July 24, 2020 email identifying vendors to BNRV); Shields Dep., Vol. II, 64:8-65:1 (acknowledging same); **Exhibits P-178** and **P-179** (July 27, 2020 deliveries of title work on Properties); Shields Dep., Vol. II, 66:11-67:16 (acknowledging same).

[75] Shields Dep., Vol. II, 68:17-69:2, 78:4-7.

[76] **Exhibit D96,** Deposition of M&T Bank Representative Michael Gollnitz 93:10-18, 120:18-121:5 (testifying that M&T Bank approved the loan commitment before March 4, 2020 and that it remained committed for 180 days).

[77] **Exhibit D97** (delivery of executed loan documents for NY Property); **Exhibit D98** (delivery of executed documents for PA Property); **Exhibit D99** (email from Campers Inn's counsel providing final update on required items).

[78] **Exhibit D100** (Post-Closing Agreement); Traylor Dep., Vol. II, 407:3-409:7 (discussing same).

<u>Tuesday, July 28, 2020</u>

On Tuesday, July 28, 2020 – the same day Campers Inn completed the property surveys and submission of its loan documents – Campers Inn and BNRV agreed to move forward with closing on Friday, July 31, 2020 of both the real estate and asset purchase transactions, having discussed the mechanics and responsibilities of closing the week prior.[79] At no point did BNRV express concern to Campers Inn about getting the deal done by close of business on Friday, July 31, 2020 or complain to Campers Inn about the delivery of the surveys that same day or any of the other issues alleged in their Complaint.[80]

<u>Wednesday, July 29, 2020</u>

On Wednesday, the parties continued to work cooperatively toward closing, with Campers Inn providing to BNRV updated draft deeds, title commitments, and surveys with comments from the title insurers to be addressed by BNRV.[81] For its part, BNRV was addressing the title insurer's questions about the Properties' title history and noting difficulty in obtaining certain required documents because of the ongoing COVID-19 pandemic.[82] Again, at no point did BNRV accuse Campers Inn of producing the surveys late, of not acting in good faith to conclude the surveys on a timely basis, or any of the other allegedly dilatory conduct BNRV alleged *post hoc* in their Complaint.[83]

<u>Thursday, July 30, 2020</u>

At 2:21 p.m. on Thursday, BNRV's M&T Bank representative, Herschel Gornbein, wrote Littlefield and Shields asking if the transaction would be closing that day.[84] M&T Bank held a

---

[79] **Exhibit D43**; Shields Dep., Vol. II, 96:18-97:23.
[80] Shields Dep., Vol. II, 97:25-99:12.
[81] **Exhibits D44** and **D45**; Shields Dep., Vol. II, 99:14-102:21.
[82] Ex. D45 at BNRV0003204 ("We don't have the school taxes yet. Although they usually come out in July, we don't have them yet. Possible COVID-19 complication? Would last year's school tax bills help?").
[83] Shields Dep., Vol. II, 102:23-103:14.
[84] **Exhibit D46**.

mortgage on the PA Property and an interest rate swap related to that mortgage, both of which

BNRV had to terminate and pay off before closing the real estate transactions.[85] At the time,

terminating the swap would have cost BNRV $█████.[86] Shields wrote back at 5:17 p.m. on

Thursday, July 30, 2020, copying Littlefield:

> Everything appears to be in order for a closing tomorrow. There were some changes to the settlement statements this afternoon and few other details that we ironed out. I expect Don or myself to be calling you first thing in the morning to terminate the Swap.[87]

BNRV did not complain to their M&T Bank representative the night before the planned closing of

the real estate transactions about anything alleged in the Complaint. In fact, Shields testified that

on Thursday night he "had no reason to believe that [the transactions] would not get done at this

point."[88]

<u>Friday, July 31, 2020 – The Anticipated Closing Date</u>

BNRV began the anticipated day of closing in a position that guaranteed BNRV would ***not***

be able to perform its contractual obligations that day. The Transaction Agreements required

BNRV to tender its closing documents, including a deed and other instruments of transfer, to the

title insurer to be held in escrow.[89] Adhering to the laws of Pennsylvania and New York, the title

insurer required the parties to provide deeds and other recordable instruments of transfer with wet

signatures, as opposed to facsimile or scanned copies.[90] BNRV's attorney, Shields, did not know

this, as he had not done any research on the requirements of closing real estate transactions in

either state and merely assumed facsimile copies would suffice.[91] On Friday, July 31, 2020, Shields

---

[85] Shields Dep., Vol. II, 104:1-20, 110:10-111:3; **Exhibit D101,** Deposition of M&T Bank representative Herschel Gornbein 23:7-25:8 (explaining how the swap and mortgage had to be terminated before closing).
[86] Littlefield Dep., Vol. I, 232:15-233:1.
[87] Ex. D46.
[88] Shield Dep., Vol. II, 109:16-22.
[89] REPA § 9; Shields Dep., Vol. I, 92:11-94:10.
[90] Shields Dep., Vol. II, 72:16-21; Traylor Dep., Vol. II, 430:24-432:8.
[91] Shields Dep., Vol. II, 72:22-73:2, 113:12-22.

was in BNRV's South Carolina location and BNRV's owner and CEO, Littlefield, was in Georgia. Shields had not investigated whether there were agents of the title insurer in either location. Nor had he made any arrangements to get original, signed documents to the title insurer/escrow agent.[92] In contrast, Campers Inn had made arrangements to deliver original, signed documents to an agent of the title insurer located in Jacksonville, Florida.[93]

Putting aside the foregoing logistical challenges to closing, the parties continued to work cooperatively toward closing the real estate transactions on Friday, July 31, 2020. BNRV's Shields and Campers Inn's Traylor were in contact throughout the day by phone and email.[94] At approximately 10:45 a.m., Traylor and Shields exchanged emails about outstanding document needs. Traylor asked Shields about the status of BNRV's Subordination Agreement with M&T Bank, which M&T Bank required before closing in order to permit BNRV to take a second mortgage on the PA Property as security for a portion of the purchase price to be paid by promissory note.[95] Without answering Traylor's question, Shields responded that he needed only two items form Campers Inn to close: (1) a final settlement statement and (2) confirmation that an error in the legal description of the PA Property deed was corrected.[96] Once these two items were provided, Shields said he would:

> call the bank to terminate our interest rate swap, Don will sign everything, we will scan everything into the title offices and your office to ensure that it has been executed appropriately, and place all the original documents with an overnight commercial carrier.[97]

At 1:05 p.m., Campers Inn delivered to Shields the two items BNRV said it needed to

---

[92] Shields Dep., Vol. II, 73:4-74:11.
[93] Traylor Dep., Vol. II, 429:22-430:9.
[94] Shields Dep., Vol. II, 119:7-16.
[95] **Exhibit D48** at Campers Inn 8338. *See* APA § 1.4(b)(iii) (re: secured promissory note); Shields Dep., Vol. II, 116:2-4 (stating that BNRV knew the subordination agreement was required for closing).
[96] Ex. D48 at Campers Inn 8337; Shields Dep., Vol. II, 116:12-117:9.
[97] Ex. D48; Shields Dep., Vol. II, 116:12-117:9 (confirming same).

proceed to closing along with additional documents.[98] Before and after this delivery at 1:05 p.m., Littlefield was signing BNRV's closing documents.[99] At 1:24 p.m., BNRV's M&T Bank representative, Gornbein, emailed Shields and Littlefield asking if the deal would close that day and, if so, that BNRV would need to terminate the swap agreement on the PA Property.[100] At 1:29 p.m., Shields responded: "***I do believe it will. There are <u>a few minor items</u> up in the air, but I don't perceive them as anything that will hold up closing.***"[101] Shields confirmed in his deposition that there "was not much to be done" for the deal to close and for his employer, Littlefield, to receive the $▮▮▮▮▮▮ purchase price.[102]

But, at 2:00 p.m., the parties' desire to close on Friday, July 31st ran up against the obstacle of M&T Bank's wire funding deadline, which cutoff for that day both Campers Inn's ability to obtain the loan proceeds for the purchase price payment and BNRV's ability to terminate its swap and pay off the existing mortgage on the PA Property.[103] BNRV knew about M&T Bank's wire funding deadline from their own M&T Bank representative, although BNRV's Shields understood the deadline to be 3:00 p.m. instead of 2:00 p.m.[104] As M&T Bank's 2:00 p.m. wire deadline approached, BNRV's Shields and Campers Inn's Traylor had a series of emails, asking each other to work with their respective bankers to push back the wire deadline. All the while, Littlefield continued to sign documents and have them notarized, even after 2:00 p.m.[105]

At 2:24 p.m., Traylor wrote Shields informing him that M&T Bank had closed the wire window for the day "because all documents weren't completed for their internal approval by 2."[106]

---

[98] **Exhibit D50**; Shields Dep., Vol. II, 127:6-128:5 (confirming receipt of two items).
[99] Shields Dep., Vol. II, 125:2-11, 137:10-19.
[100] **Exhibit D51**.
[101] *Id.* (emphasis added).
[102] Shields Dep., Vol. II, 129:10-24; 218:14-219:3.
[103] Gornbein Dep. 45:7-18.
[104] Gornbein Dep. 45:19-23, 77:15-78:3; Shields Dep., Vol. II, 130:15-131:8, 134:11-19.
[105] **Exhibits D52, D53, D54.**
[106] Ex. D54.

At 2:35 p.m., Traylor told Shields that they should continue to wrap everything up that afternoon "and funding will have to come on Monday."[107] A minute later at 2:36 p.m., Shields asked whether M&T Bank would honor the loan commitment after Friday, July 31st, to which Traylor responded at 2:41 p.m. that M&T Bank had confirmed that it would honor the loan commitment and fund on Monday, August 3rd.[108] Traylor closed his response by stating: "Let's keep driving to get everything done today though so we can sleep well this weekend."[109] At 2:45 p.m., Traylor informed Shields that Campers Inn had paid into escrow their equity portion of the purchase price payment, leaving only the loan funding for Monday.[110]

Shields went silent after his 2:36 p.m. email to Traylor. At 5:01 p.m., Traylor reached out again, asking "What's your thought on wrapping this up today?," to which Shields responded by asking whether M&T Bank had paid into escrow the purchase price money, even though he knew the funding window closed at 2:00 p.m. and that BNRV had not sent into escrow any of their closing documents – a condition precedent to payment of the purchase price.[111] Traylor responded that M&T Bank had not because they did not have the necessary documents, specifically, the Subordination Agreement between BNRV and M&T Bank and the instruments of property transfer, including deeds, signed by BNRV. Traylor asked Shield to call him to "discuss your understanding of where we are."[112] After not hearing back from Shields, Traylor emailed him again at 5:45 p.m.:

> We have received confirmation from all title agents that all of the buyer documents are complete and in hand. One question is where are the executed deeds and what are your plans for delivering them to the title company so they have them Monday, because without those they will not ensure title.  Without that, M&T will not fund. Let me know ASAP or call

---

[107] *Id.*
[108] *Id.*
[109] *Id.*
[110] **Exhibit D55.**
[111] **Exhibit D56**.
[112] *Id.*

me to discuss.[113]

Shields did not respond to Traylor until 7:26 a.m. on Saturday, August 1, 2020, when he wrote: "At 10:05 p.m. I received a text from Mr. Littlefield that simply says '*we'll handle it next week.*' I sorry I don't have more to relay."[114] As explained in Section II(J) below, *this was a lie*. When Shields sent the foregoing email to Traylor on Saturday morning, Shields knew that Littlefield had decided a little after 2:00 p.m. on Friday not to produce BNRV's closing documents and not to proceed any further with Campers Inn.[115]

**I.     Campers Inn and M&T Bank Continue to Work Over the Weekend Toward Funding on Monday, August 3, 2020.**

Not knowing of Littlefield's Friday afternoon decision to proceed no further with Campers Inn, Traylor and others at Campers Inn worked with M&T Bank over the weekend to proceed with funding on Monday, August 3, 2020. M&T Bank's internal approval for the acquisition loans was good through the end of August 2020. On Sunday, August 2, 2020, M&T Bank sent to Campers Inn two new Term Note documents for the acquisition of the NY and PA Properties on Monday, August 3, 2020.[116] But the question remained: *where were BNRV's signed closing documents?*

**J.     Unbeknown to Campers Inn, BNRV Decides on Friday July 31, 2020 Not to Proceed to Closing.**

After Littlefield learned on the afternoon on Friday, July 31st that the wire window for funding the acquisition loans had closed for the day, he decided not to send to the title insurer/closing agent any of BNRV's closing documents, including signed deeds, bills of sale, the subordination agreement, and the swap termination instructions, all of which were ready for

---

[113] **Exhibit D57.**

[114] **Exhibit D58** (emphasis added).

[115] Shields Dep., Vol. II, 158:12-160:4 (discussing Littlefield's decision on Friday to not proceed further toward closing); **Exhibit D87** (Friday evening email among Littlefield and Shields decision to proceed no further with Campers Inn); Shields Dep., Vol. II, 160:7-163:1 (discussing Ex. D87); *id.* 163:2-164:5 (testifying about his lying to Traylor).

[116] **Exhibits D102** (Campers Inn 11855-63) and **D103** (Campers Inn 11864-71); Gollnitz Dep. 70:5-72:23 (M&T Bank representative stating he worked over the weekend to provide new term note documents).

tender.[117] Littlefield also decided not to tell Campers Inn, the title insurer/closing agent, or anyone outside of BNRV about his decision.[118] Littlefield's decision followed a telephone call with BNRV's M&T Bank representative, Gornbein, who could not tell Littlefield exactly when M&T Bank would fund its loan commitments to Campers Inn:

> The first thing that Don knows is that **Hersch Gornbein . . . I figured he would know about everything**. So I asked him . . . "Will we – when will we get funded?" And he said "I don't know." I said, "Will we get funded on Monday"? He said, "I don't know." I said, "Will we get funded on Tuesday?" He said, "I don't know." I said, "Hersch, when will we get funded?" He said, "That's going to be up to the buyer, and I can't give you that information. I don't know when you're going to get – I can't give you that information."[119]

Gornbein, of course, could not provide any information about the funding of the acquisition loans because he was not responsible for them; Campers Inn's M&T Bank representative, Gollnitz, was responsible for them.[120] Following his call with Gornbein, Littlefield shut down any further dealings with Campers Inn because, as he testified in his deposition:

> [I]n my business, it's you buy something, you pay for it, then we give you the title. And I called there – I called there. I asked, "Are they going to disburse the money?" And I was told, "No." And I asked when they were going to disburse the money, this is M&T, and I was told they didn't know. **So I didn't feel it was the correct decision to send in the deed to my property signed over to someone else without having money in an escrow account to pay for it.**[121]

Littlefield further testified that **he made the decision to end all dealings with Campers Inn without knowing a number of critical facts**:

- Littlefield did not know that, if he tendered to the title insurer/closing agent BNRV's signed closing documents, including the deeds to the Properties, they would be held in escrow and not disbursed until all closing documents and the purchase money were also received into escrow;

---

[117] Littlefield Dep., Vol. I, 285:12-286:12, 289:13-290:3.
[118] *Id.*
[119] Littlefield Dep., Vol. I, 281:20-282:9 (emphasis added).
[120] Gornbein Dep. 12:19-24, 55:14-56:11 (stating he has no responsibility for Campers Inn and that Littlefield was mistaken in his assumption).
[121] Littlefield Dep., Vol. I, 290:4-20 (emphasis added).

21

- Littlefield did not know that M&T Bank would not and could not fund the acquisition loans until it had BNRV's signed closing documents and the Subordination Agreement; and

- Littlefield did not know that M&T Bank had agreed to fund the acquisition loans after Friday, July 31, 2020.[122]

Following receipt of Shields' email sent at 7:26 a.m. Saturday, August 1, 2020, in which Shields told Campers Inn that Littlefield said "We'll handle it next week," Campers Inn did not hear again from BNRV until 10:51 p.m. on Sunday, August 2, 2020, when BNRV copied Campers Inn's counsel on an email transmitting a letter to the escrow agent (*i.e.*, Attorney Jonathan Krause of the law firm Klehr Harrison Harvey Branzburg LLP), instructing him to release to BNRV the $750,000 Campers Inn placed in escrow pending closing.[123] Notably, nowhere in this letter does BNRV accuse Campers Inn of having breached the Transaction Agreements or state that BNRV was exercising termination rights under the Transaction Agreements.[124]

Having heard nothing more from BNRV the next day, Monday, August 3, 2020, Campers Inn sent a formal letter to BNRV, in which Campers Inn notified BNRV of certain title defects to be cured by BNRV pursuant to Section 5(c) of the REPA, as amended by Section 3(e) of the Addendum, and demanded tender of BNRV's signed closing documents.[125] Campers Inn further informed BNRV:

> Buyer has provided all required closing documents, transmitted all funds due from Buyer to the Title Company, and, with the delivery of this letter, satisfied all of its obligations under the APA and [REPA] that are required for the consummation of all transactions contemplated by the APA and [REPA], as amended by the Addendum. Upon full performance by Seller and receipt of (or waiver by Buyer and M&T Bank) the Remaining Required Closing Documents, it is our understanding that M&T Bank remains committed to funding the transactions. Accordingly, Seller is required, as appropriate, to take the actions to cure the defects identified

---

[122] Littlefield Dep., Vol. I, 290:21-292:2, 292:14-294:11, 279:5-22. BNRV's General Counsel, Shields, disputes Littlefield's claims that he did not know these facts. Shields Dep., Vol. II, 143:20-145:3. Shields also cannot explain why Shields, the CEO and owner of BNRV, claims to have not known these important facts. Shields Dep., Vol. II, 176:16-177:5. But Littlefield was the decisionmaker, not Shields. *Id.* 172:5-7.
[123] **Exhibits D60** and **D60.1**.
[124] Shields Dep., Vol. II, 181:13-23.
[125] **Exhibit D61.**

above and, to the extent not included within the scope of such actions, promptly deliver the documents specified in Section 10(a) of the [REPA] to the appropriate escrow agents of the Title Company for each Property.[126]

Campers Inn warned BNRV that if BNRV failed to comply with its contractual obligations, Campers Inn "will seek specific performance of Sellers' obligations under such agreements, as well as enforcement of any other rights and remedies it may have under applicable law."[127]

Even though there "was not much to be done" for the deal to close and for Littlefield to receive the $██████ purchase price on Monday, August 3, 2020, BNRV did not respond to Campers Inn's demand.[128] When asked at his deposition why BNRV did not move forward with closing on Monday, August 3, 2020, Littlefield answered:

> Well, first, I didn't believe that Campers Inn could go forward with the deal. Secondly, I had six months of waiting and lots of lost profit. And I've just – I decided that was just enough time. That six months was enough time.[129]

BNRV did not communicate with Campers Inn again until Friday, August 7, 2020, when BNRV's outside counsel, Paige Willan of the law firm Klehr Harrison Harvey Branzburg LLP wrote to Campers Inn, stating only that "Seller is . . . entitled to terminate the" Transaction Agreements, but not stating that BNRV was, in fact, seeking to exercise termination rights under the Transaction Agreements.[130] Instead, BNRV offered to let Campers Inn keep its $750,000 "in exchange for a general release from Buyer and a confidentiality agreement, both in a form acceptable to Seller." [131]

When Campers Inn rejected BNRV's demand, BNRV filed the instant lawsuit on

---

[126] *Id.*

[127] *Id.*

[128] Shields Dep., Vol. II, 129:10-24; 218:14-219:3.

[129] Littlefield Dep., Vol. II, 177:13-18.

[130] **Exhibit D62** (stating, in pertinent part at 2: "On 5:00 PM on July 31, 2020, Seller stood ready to close but, once again, Buyer was not prepared. As a result, the transaction did not close as required by the Sale Agreement and the Addendum, due solely to Buyer's delay. Under the Sale Agreement and the Addendum, ***Seller is therefore entitled to terminate the Sale Agreement*** and receive the full $750,000 deposit currently held in escrow as liquidated damages.") (emphasis added).

[131] *Id.*

Thursday, August 13, 2020. Nowhere in the Complaint does BNRV allege to have exercised rights under Section 9.1 of the APA to terminate the Transaction Agreements. To the contrary, in its declaratory judgment claim, BNRV in fact requests a declaration from the Court that "because Buyer failed to close as required by the contracts, the APA and the RPA are terminated and of no further effect[.]"[132] Also, BNRV attached to its publicly filed Complaint copies of the Transaction Agreements with only minimal redactions, even though BNRV had no legal obligation to attach these documents to its Complaint and these documents are subject to the APA's confidentiality provision.[133] As explained in Section II(K) below, BNRV made the Transaction Agreements publicly available when it was still negotiating with Camping World real estate and asset purchase agreements for the same Properties and Dealerships.

On August 25, 2020, Campers Inn filed its Answer and Counterclaim alleging that BNRV breached the Transaction Agreements and demanding injunctive relief and specific performance of BNRV's obligation to convey the Properties and Dealerships to Campers Inn.[134] That same day, Campers Inn filed a Notice of *Lis Pendens* on both Properties and a Motion for Preliminary Injunction demanding specific performance of BNRV's contractual obligation to convey the Properties and Dealerships to Campers Inn.[135]

### K.     Unbeknown to Campers Inn, BNRV Executes Strategy to Sell the Properties and Dealerships to Camping World for an Additional $1.5 Million.[136]

The week prior to the contemplated closing of the transactions with Campers Inn, BNRV learned of interest in the same Properties and Dealerships by Camping World, America's largest retailer of RVs with over 171 locations.[137] On Saturday, July 25, 2020, one of BNRV's suppliers,

---

[132] Complaint (ECF No. 1) ¶ 94.
[133] Complaint (ECF No. 1) Exs. A, B, C, and F; APA § 4.1 ("Confidentiality").
[134] Answer and Counterclaim (ECF No. 8).
[135] *See* ECF Nos. 9, 11.
[136] **Attached hereto as Exhibit D104 is a timeline contrasting BNRV's dealings with Campers Inn with its dealings with Camping World.**
[137] Camping World Holdings, Inc., Form 10-K, December 31, 2020.

Aaron Young of Dutchmen Manufacturing, called Littlefield to inform him that Young had learned from a shared acquaintance at Camping World, Tammi Hopkins, that Camping World was interested in buying the Properties and Dealerships.[138] Unknown to Young, Hopkins had already contacted Littlefield directly and told him: "Camping World is in acquisition mode, so we would be interested, if you don't close" with Campers Inn.[139] Littlefield instructed Young to relay to Camping World through Hopkins that "if the title company doesn't call him [*i.e.*, Littlefield] by Wednesday [July 29, 2020], he will call you to set something up."[140] The next day, Monday, July 27, 2020, Young conveyed Littlefield's message to Camping World's Hopkins.[141] Neither Littlefield nor anyone else associated with BNRV notified Campers Inn of this solicitation, despite BNRV's obligation to do so under the APA's No Shop clause.[142]

The morning after Littlefield's decision to shut-down further dealings with Campers Inn – Saturday, August 1, 2020 – Littlefield received a call on his cell phone from Josh Erickson, Regional President of Camping World. Littlefield testified that he has no idea how Erickson obtained his unlisted cell phone number.[143] Erickson told Littlefield "Camping World might have some interest in the property" and asked him to take a call with Camping World's leadership.[144] The next day, Sunday, August 2, 2020, Littlefield had a conference call with Marcus Lemonis, CEO of Camping World, and Brent Moody, Camping World's President.[145] In this call, "Camping World formally expressed interest in acquiring Plaintiffs' land and personal property assets in New

---

[138] **Exhibit D105,** Deposition of Aaron Young 24:6-25:25 (describing relationship with BNRV), 30:23-31:13 (describing relationship with T. Hopkins of Camping World), 47:18-48:7 (describing call with T. Hopkins on Saturday. July 25, 2020).

[139] Littlefield Dep., Vol. II, 37:5-39:4.

[140] Young Dep. 48:11-50:11. *See also id.* 51:15-23, 52:21-23 (confirming that Littlefield knew Young would communicate his message to Hopkins of Camping World).

[141] **Exhibit D106** [Young Dep. Ex. 3 at 4 of 44]; Young Dep. 18:11-15, 47:5-8 (identifying and confirming text exchange with Camping World's Hopkins).

[142] APA § 4.3; Littlefield Dep., Vol. I, 179:7-21.

[143] Littlefield Dep., Vol. I, 112:5-24; Ex. D-18, Response to Interrog. No. 1.

[144] *Id.* 113:3-12.

[145] *Id.* 167:23-169:15.

York and Pennsylvania" and Littlefield agreed to provide Camping World with appraisals and other information about the Properties.[146] Littlefield testified that he told Camping World he wanted to proceed with a transaction with Camping World but that it had to be done quickly.[147] Littlefield further testified that he never told Campers Inn about these communications and that he instructed BNRV's staff not to do so either.[148]

The next morning, Monday, August 3, 2020, Littlefield sent the following email to Shields and Hoffman, copying Camping World's President Moody[149]:

> Thomas,
>
> Please send the following :
>
> 1. NDA
> 2. Appraisals of the property- NY and PA
> 3. Statements for 2017, 2018, and 2019 for NY and PA. Nothing else to do with any other store or the factories
> 4. Employee Roster and info.
> 5. Copy of the Campers Inn Sales Contract ( if law permits)
> 6. Information of the assets of each store. I believe the number was around 650K.
>
> We need to move quickly, it looks like the Price would be 17,318 which is only 341K more than we are receiving from Campers Inn and we will have some legal expense.
>
> We need to figure out which position is best for the company.

In addition to instructing Shields to send the Transaction Agreements and other materials to Camping World in this email, Littlefield disclosed to Camping World the original purchase price Campers Inn had agreed to in the APA (*i.e.*, "the Price would be 17,318 which is only 341K more than we are receiving from Campers Inn"), notwithstanding his obligations under the Confidentiality and No Shop provisions of the APA.[150] By expressing the "need to move quickly," Littlefield "wanted to conclude a deal with Camping World while they seemed to be extremely

---

[146] Ex. D18, Response to Interrog. No. 1; Littlefield Dep., Vol. I, 171:4-9.
[147] Littlefield Dep., Vol. I, 175:21-24.
[148] *Id.* 179:7-21.
[149] **Exhibit D64.**
[150] Littlefield Dep., Vol. II, 23:6-24:14; Shields Dep., Vol. I, 80:11-81:14.

26

interested" so that he could get "paid quickly."[151] Littlefield and his team were fully cognizant of the risk of a lawsuit and injunction request by Campers Inn and the associated "legal expense."[152] Accordingly, Littlefield told Shields and Hoffman they needed "to figure out which position is best for the company."[153]

On Tuesday, August 5, 2020, BNRV received a draft term sheet from Camping World, which the parties executed on Saturday, August 8, 2020.[154] The total purchase price Camping World agreed to pay BNRV for the Properties and Dealerships was $▇▇▇▇▇▇, which is approximately $1.5 million more than want BNRV would have received from Campers Inn under the APA and REPA, as amended by the Addendum.[155] Despite Littlefield's interest in getting "paid quickly," he agreed in the August 8, 2020 term sheet with Camping World to a 30-day diligence period, thus guaranteeing that the transactions would not close until after September 8, 2020 at the earliest.[156] Campers Inn was not informed of any of these developments. In fact, the day after Littlefield signed the term sheet with Camping World, *i.e.*, Sunday, August 9, 2020, Littlefield spoke with Campers Inn's Jeff Hirsch about getting a release of claims from Hirsch in exchange for returning to Campers Inn the $750,000 of its money held in escrow, but without mentioning Littlefield's new commitment to Camping World.[157]

Over the next several days, BNRV and Camping World worked toward finalizing their transaction agreements. Pursuant to instructions from Littlefield and without informing Campers Inn, Shields provided to Camping World the surveys and title work prepared by the surveyors and

---

[151] Shields Dep., Vol. II, 206:9-23.
[152] Shields Dep., Vol. II, 220:1-14 (discussing the final term sheet agreed to with Camping World on August 8, 2020 which addresses the risk of a lawsuit and injunction request by Campers Inn).
[153] Ex. D64.
[154] **Exhibit D82**; Shields Dep., Vol. II, 213:16-21.
[155] Ex. D82 ¶ 2; Shields Dep., Vol. II, 215:16-21.
[156] Ex. D82 ¶ 5(b); Shields Dep., Vol. II, 218:14-219:9.
[157] Littlefield Dep., Vol. II, 43:16-45:9.

title insurers that Campers Inn hired and paid.[158] Camping World thanked BNRV for the materials obtained from Campers Inn, stating: "[t]his should hopefully help our title company expedite work."[159] On Monday, August 17, in an email to Camping World's Lemonis, Littlefield commented that the draft transaction documents were moving along and "███████████████ ██████████████████████████████," to which Lemonis responded: "███████ ██████████████████████████████"[160]

BNRV and Camping World signed real estate and asset purchase agreements on Wednesday, August 19, 2020.[161] The total purchase price remained as stated in the term sheet: $███████[162] Despite Littlefield's claimed hurry to get his money, BNRV and Camping World did not agree to a fixed date for closing of the real estate transaction. Instead, they agreed the real estate closing would occur "███████████████████ ██████████████ ████████████████████████████████████████ ███████████████████████."[163] BNRV also agreed to indemnify Camping World for "[a]ny and all losses, damages or deficiencies resulting from or relating to the Campers Inn Litigation," *i.e.*, the lawsuit commenced by BNRV against Campers Inn six days earlier. BNRV agreed to this broad indemnity provision without any cap "because they wanted to sell the property" even though liability could result in indemnification of "a sizable sum" in the millions of dollars.[164]

BNRV and Camping World did not close their transactions until almost two months later

---

[158] *See* **Exhibits D65** and **D66** (surveys sent on August 11, 2020), **Exhibits D-68** and **69** (title work sent on August 20, 2020); Shields Dep., Vol. I, 71:18-72:4.

[159] Ex. D-69.

[160] **Exhibit D70** (emphasis added).

[161] **Exhibits D72** (Pennsylvania asset purchase agreement), **D73** (New York asset purchase agreement), **D74** (New York real estate purchase agreement), and **D75** (Pennsylvania real estate purchase agreement).

[162] *Id.*

[163] *See, e.g.*, Ex. D74 § 10.

[164] Shields Dep., Vol. III, 21:13-19, 23:3-19.

on October 9, 2020.[165] By that time, Campers Inn had filed a counterclaim seeking specific enforcement of the Transaction Agreements with BNRV, a motion for preliminary injunction seeking the same, and a notice of *lis pendens* attached to both the NY and PA Properties. The day before closing, on October 8, 2020, Camping World required BNRV to enter into two additional agreements: (i) a First Amendment to Asset Purchase Agreements and Second Amendment to Real Estate Purchase Agreements and (ii) a Holdback Escrow Agreement.[166] The import of these documents are three-fold. First, they required $███████ of the purchase price payment to be held in escrow and available to indemnify Camping World for any losses, damages, fees or costs arising out of BNRV's litigation with Campers Inn.[167] Second, they made clear that BNRV and Littlefield, personally, were solely responsible for every cent Camping World must spend for litigation or events arising out of BNRV's litigation with Campers Inn, including Camping World's attorney's fees.[168] Third, they describe in detail the method by which BNRV will reimburse Camping World in the event this Court issues an order to unwind BNRV's and Camping World's transactions so that the Properties and Dealerships may be conveyed to Campers Inn.[169] When asked in his deposition why he agreed to these onerous indemnification provisions with Campers Inn after Lemonis promised him they would "████████████████████," Littlefield answered: "█████████████."[170]

### III.   THE LEGAL STANDARD FOR SUMMARY JUDGMENT.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no

---

[165] *Id.* 26:5-8.

[166] **Exhibits D76** and **D77**; Shields Dep., Vol. III, 39:11-20 ("This document was required – or the – Camping World required this document to close because they decided they were going to close over any objection that they would have had in connection with the Camping – Campers Inn litigation.").

[167] Ex. D76 § 3, 9; Ex. D-77 § 3.

[168] *Id.*

[169] *Id.*

[170] Littlefield Dep., Vol. II, 87:1-16.

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

## IV.     THE UNDISPUTED FACTS ESTABLISH THAT BNRV IS LIABLE FOR BREACH OF CONTRACT.

To obtain summary judgment on its claim for breach of contract against BNRV, Campers Inn must show that there is no genuine issue as to any material fact regarding: (1) the existence of a contract; (2) performance by Campers Inn; (3) breach by BNRV; and (4) injury. *See Rabin v. Mony Life Ins.*, 2007 WL 737474, at *2 (S.D.N.Y. Mar. 8, 2007) (citing *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)). The undisputed facts show that Campers Inn performed its obligations under the Transaction Agreements and was ready, willing, and able to proceed to closing of the transactions, which failed to close because BNRV refused to tender its closing documents, failed to cure title defects, and sold the Properties and Dealerships to Camping World, all in material breach of the Transactions Agreements.[171]

### A.     Campers Inn Performed Its Pre-Closing Obligations.

In this lawsuit, BNRV has concocted a *post hoc*, false narrative, blaming Campers Inn for the failure of the transactions to close. But the undisputed facts, particularly BNRV's statements at the time of the contemplated closing, show that Campers Inn performed its obligations under the Transaction Agreements and was ready, willing, and able to proceed to closing of the transactions.

BNRV's statements to its own M&T Bank representative, Gornbein, immediately before

---

[171] The parties do not dispute the validity of the APA and REPA, as amended by the Addendum.

the contemplated closing date of Friday, July 31, 2020, show there were no material issues that would impede closing. In emails in which he copied Littlefield, BNRV's General Counsel, Shields, told Gornbein on Thursday, July 30, that *"[e]verything appears to be in order for a closing tomorrow."*[172] And, on Friday, July 31 at 1:29 p.m., Shields informed BNRV's M&T Bank representative that *"[t]here are a few minor items up in the air, but I don't perceive them as anything that will hold up closing."*[173] Reviewing these emails in his deposition, Shields admitted again that there "was not much to be done" at that time for the deal to close and for BNRV to receive the $███████ purchase price.

The undisputed facts also show that Campers Inn had secured its acquisition financing and tendered its closing documents to the title insurer/closing agent before or on the contemplated closing date. Campers Inn's loan commitment from M&T Bank was valid through the end of August 2020.[174] Campers Inn completed tender of all required loan documents to M&T Bank on Tuesday, July 28, 2020.[175] And, on Friday, July 31, 2020, the title insurer/closing agent confirmed receipt of Campers Inn's closing documents, after which Campers Inn paid into escrow the equity portion of the purchase price payment.[176]

It is further undisputed that, when M&T Bank's wire funding window closed at 2:00 p.m. on Friday, July 31, 2020 – *a deadline known to both Campers Inn and BNRV* – Campers Inn continued to work with M&T Bank over the weekend and secured M&T Bank's commitment to fund the acquisition loans the next business day, Monday, August 3, 2020.[177]

In sum, there is __*no*__ genuine issue as to any material fact of Campers Inn's performance and its readiness, willingness, and ability to close the transactions.

---

[172] Ex. D46 (emphasis added).
[173] Ex. D51 (emphasis added); Shields Dep., Vol. II, 129:10-14, 218:14-219:3.
[174] *See* Section II(G) *supra*.
[175] *Id.*
[176] Exs. D55, D57.
[177] *See* Section II(I) *supra*.

**B.** **BNRV Materially Breached the Transaction Agreements in Multiple Ways.**

The undisputed facts show that fault for the transactions' failure to close lies with BNRV.

Foremost among BNRV's breaches of the Transaction Agreements is BNRV's refusal to tender its closing documents to the title insurer/closing agent, thus guaranteeing that the transactions would not, and could not, close on Friday, July 31, 2020, or any day thereafter. As set forth in Section II(J) above, Littlefield, by his own admission, refused to send into escrow on Friday, July 31, 2020 any of BNRV's closing documents, including signed deeds, bills of sale, the subordination agreement, and swap termination instructions. The Transaction Agreements required BNRV to tender these documents for the transactions to close and for BNRV to receive the purchase price payment.[178] Littlefield refused to tender BNRV's closing documents shortly after 2:00 p.m. on Friday, July 31, 2020, because, in his mind, he didn't get his money by then and "six months was enough time."[179] None of Littlefield's admitted reasons for refusing to tender BNRV's closing documents into escrow has any basis in the Transaction Agreements.[180] Littlefield made an ill-informed and unwise decision to breach the Transaction Agreements. In sum, there is **_no_** genuine issue as to any material fact concerning this obvious, willful, and egregious breach.

Moreover, Littlefield refused to change course when, on Monday, August 3, 2020, Campers Inn wrote BNRV demanding delivery of their closing documents to the title insurer/closing agent and that BNRV cure certain title defects, both of which BNRV refused to do.[181] Even though BNRV knew, on Friday, July 30, 2020, that there "was not much to be done" for the deal to close, and, on Monday, August, 3, 2020, that Campers Inn had "provided all required

---

[178] APA §§ 6.1(f), 7(a); REPA § 10(a).

[179] Littlefield Dep., Vol. I, 281:20-282:9, 290:4-20; Littlefield Dep., Vol. II, 177:13-18.

[180] *See* Section II(J) *supra* at __ (listing several important facts Littlefield claims not to have known when he decided to breach).

[181] Ex. D61 at 1 (stating, *inter alia*, "[t]he survey for the Hamburg Store was not completed in a form sufficient to satisfy the requirements of the Title Company until Thursday, July 30, 2020. Accordingly, in accordance with [section 3(e) of] the Addendum, Buyer hereby provides Seller with the following objections to title, which must be satisfied at or prior to the Real Estate Closing.").

closing documents, transmitted all funds due . . . to the Title Company, and . . . satisfied all of its obligations under the APA and PSA that are required for the consummation of all transactions contemplated by the APA and the PSA," BNRV did not reconsider Littlefield's refusal to tender BNRV's closing documents and to proceed to closing.[182]

BNRV also breached the confidentiality provisions of Sections 4.1 and 4.3 of the APA by disclosing confidential information and transaction-related documents to Camping World and others. Section 4.1 of the APA required BNRV to "hold in strict confidence" "all information obtained from Buyer . . . in connection with the Transactions." And Section 4.3 prohibited BNRV from "divulg[ing] or otherwise disclos[ing] any material information to any Person other than Buyer regarding any aspects of the Agreement, or matters related thereto, including the Purchase Price, terms, conditions, financing, or status of negotiations and discussions between [BNRV and Campers Inn.]" BNRV materially breached these contractual provisions in multiple, material ways:

- Before Saturday, July 25, 2020, Littlefield discussed the "status of negotiations and discussions" between BNRV and Campers Inn with Camping World's Tammi Hopkins;[183]

- On or around Sunday, July 26, 2020, Littlefield discussed the same with and Dutchman Manufacturing's Aaron Young, and instructed him to tell Camping World that Littlefield would call Camping World if his deal with Campers Inn did not close by Wednesday, July 29, 2020, which Young did by text message to Hopkins the next day;[184]

- On Saturday and Sunday, August 1 and 2, 2020, Littlefield discussed the "status of the negotiations and discussions between BNRV and Campers Inn" with Camping World's CEO, Lemonis, President, Moody, and Regional Manager, Erickson;[185]

- Littlefield disclosed to Camping World the "Purchase Price" of his deal with Campers Inn via email on Monday, August 3, 2020, if not earlier;[186]

---

[182] *Id.* at 2.
[183] *See* Section II(K) *supra*.
[184] *Id.*
[185] *Id.*
[186] *Id.*; Ex. D64.

- On Tuesday, August 11, 2020, BNRV provided to Camping World the surveys of the Properties ordered and paid for by Campers Inn;[187]

- On Thursday, August 13, 2020 – *while BNRV and Camping World were negotiating the terms of their own transaction documents* – BNRV published publicly with their Complaint against Campers Inn the APA, REPA, and Addendum, with only the most minor redactions;[188] and

- On Thursday, August 20, 2020, BNRV provided Camping World all of the title work performed by the title insurers hired and paid by Campers Inn, for which Camping World thanked BNRV because the unauthorized disclosures of Campers Inn's title work "should hopefully help our title company expedite work."[189]

Last is the most egregious and obvious breach: BNRV's violation of the APA's No Shop provision by negotiating the sale of, and, ultimately, selling, the Properties and Dealerships to Camping World. As set forth in detail in Section II(K) *supra* and as summarized in Exhibit D-104 (Comparative Timeline of BNRV's Dealings with Campers Inn and Camping World), BNRV's discussions about a deal with Camping World began at some point before July 25, 2020, when Camping World's Hopkins told Littlefield Camping World was interested in the Properties and was in "acquisition mode."[190] Littlefield then communicated to Camping World through an interloper, Dutchmen Manufacturing's Young, that Littlefield would contact Camping World about a possible deal after Wednesday, July 29, 2020.[191] By the next weekend, Saturday and Sunday August 1 and 2, Littlefield was in direct negotiations with Camping World's top executives about Camping World acquiring the Properties and Dealerships.[192] BNRV and Camping World had a signed term sheet by Saturday, August 8, and signed transaction documents as of Wednesday, August 19, 2020. At no point did BNRV ever comply with its contractual obligation "to provide [Campers Inn] with notice [of any inquiry, proposal or offer] promptly . . . including the identity

---

[187] *See* Section II(K).
[188] *See* Section II(K); Complaint (ECF No. 1) and Exhibits A, B, and F.
[189] *See* Section II(K); Exs. D68 and D69.
[190] *See* Section II(K) *supra*.
[191] *Id.*
[192] *See* Section II(K); Ex. D104 [Timeline].

of the prospective purchaser . . . and the terms of any such proposal. . . ."[193] The last undisputed

fact of BNRV's breach of the APA's No Shop provision is, of course, the October 9, 2020 closing

of the sale of the Properties and Dealerships to Camping World.[194]

### C. Campers Inn's Injury – Its Loss of the Properties and Dealerships – Is Indisputable.

As a result of BNRV's material breaches of the Transaction Agreements, Campers Inn has

suffered substantial injuries, the foremost of which is the undisputed fact that BNRV sold the

Properties and Dealerships to Campers Inn's direct competitor, Camping World.[195] It is well-

accepted that the deprivation of rights to real property is not merely injurious, it is an irreparable

harm. *See Minard Run Oil Co. v. United States Forrest Serv.*, 670 F.3d 236, 255-56 (3d Cir. 2011),

*as amended* (Mar. 7, 2012) (holding that the deprivation of real property results in irreparable

harm).[196]

### D. BNRV's Arguments that "Time Was of the Essence" to Closing By 5:00 PM on Friday, July 31, 2020 and that the Transaction Agreements "Self-Terminated" at that Time Are Fallacious and Wrong.

#### 1. "Time" Was *NOT* "of the Essence" to the Closing Date of the Transactions, as Amended by the April 24, 2020 Addendum.

This Court already concluded that the "time is of the essence" language appended to the

original closing date of April 15, 2020 in Section 7.1 of the APA did *not* carryover to the staggered

---

[193] APA § 4.3.

[194] *See* Section II(K) *supra.*

[195] Pursuant to Paragraph 1 of the Court's Scheduling Order, dated October 25, 2021 (ECF No. 45), Campers Inn's damages are to be addressed in a separate phase following a decision on liability and rightful ownership of the Properties and Dealerships.

[196] In *Minard Run Oil Co.*, the Third Circuit cited the following authorities: *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1090 (7th Cir.2008) ("As a general rule, interference with the enjoyment or possession of land is considered 'irreparable' since land is viewed as a unique commodity"); *East Tenn. Natural Gas Co. v. Sage*, 361 F.3d 808, 828–29 (4th Cir. 2004) (excluding owner from real property constituted irreparable injury); *Wonderland Shopping Ctr. Venture Ltd. P'ship v. CDC Mortg. Capital, Inc.*, 274 F.3d 1085, 1097 (6th Cir.2001) (foreclosure causes irreparable injury because it results in loss of "unique real property"); *Carpenter Tech. Corp. v. City of Bridgeport*, 180 F.3d 93, 97 (2d Cir.1999) (condemnation of real property constitutes irreparable harm because condemnee has no adequate remedy at law); *K–Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir.1989) ("Real estate has long been thought unique, and thus, injuries to real estate interests frequently come within the ken of the chancellor").

and postponed closing dates for the real estate and asset purchase transactions in the April 24, 2020 Addendum. BNRV nevertheless disagrees with the Court and continues to maintain that closing by 5:00 p.m. on Friday, July 31, 2020 was "of the essence" to the transactions.[197] In its Memorandum and Opinion, dated November 10, 2021, this Court held that "nowhere in the Addendum does it mention that 'time is of the essence'" and that "attaching 'time is of the essence' language to the Addendum would make the contract unworkable" given the provisions in the Addendum (specifically, Sections 3(e) and 3(f)) "allow[ing] the parties a workable and flexible schedule to complete the closing around the unpredictive nature of the pandemic and government lockdowns."[198] The Court reached these conclusions based on well-established principles of construction and interpretation of contracts and in a matter in which the parties agree the language of the Transaction Agreements is unambiguous.[199]

This Court interpreted the meaning of the terms of the unambiguous Transactions Agreements as a matter of law. *Russack v. Weinstein,* 291 A.D.2d 439 (NY 2002) ("The interpretation of the terms of a written agreement that are clear and unambiguous ***is a matter of law for the court***, and the court should construe the words and phrases used according to their plain meaning.") (emphasis added). Accordingly, the Court's decision that "time" was ***not*** "of the essence" to the staggered and postponed closing dates agreed to in the Addendum is ***the law of this case***, which should not be disturbed. *See Braverman Kaskey, P.C. v. Toidze*, 2013 WL 6095679, at *15 (E.D. Pa. Nov. 19, 2013) (Rufe, J) (citing *ACLU, et al. v. Mukasey*, 534 F.3d 181, 187 (3d Cir. 2008) ("Under the law of the case doctrine, 'when a court decides upon a rule of law,

---

[197] Littlefield Dep., Vol. I, 257:5-13 (disagreeing with the Court); Shields Dep., Vol. I, 137:16-139:5 (same).

[198] Memorandum and Order (ECF No. 47) at 16-17.

[199] *See* Shields Dep., Vol. II, 54:23-55:9 (stating that nothing in the Transaction Agreements is ambiguous); *See* Memorandum and Opinion (ECF No. 47) at 17 (citing *Ronnen v. Ajax Elec. Motor Corp.*, 671 N.E.2d 534, 536 (N.Y. 1996) ("We have long and consistently ruled against any construction which would render a contractual provision meaningless or without force of effect"). *See Lockheed Martin Corp. v. Retail Holdings, N.V.,* 639 F.3d 63, 69 (2d Cir. 2011) ("When an agreement is unambiguous on its face, it must be enforced according to the plain meaning of its terms." (citing *S. Rd. Assocs., LLC v. IBM,* 4 N.Y.3d 272 (2005)).

that decision should continue to govern the same issues in subsequent stages in the same case'" except in "'extraordinary circumstances.'"). Because closing the real estate transactions by 5:00 p.m. on Friday, July 31, 2020 was **_not_** "of the essence" to the transactions, carrying over closing to the next business day or week was an immaterial event, and BNRV had no right whatsoever to refuse to perform its obligation to transfer the Properties and Dealerships to Campers Inn. *See Singh v. Carrington*, 18 A.D.3d 855, 857 (N.Y. App. Div. 2005) ("Delay in performance of a contract where time is not of the essence is not a material breach[.]"); *Willoughby Rehab. v. Webster*, 134 A.D.3d 811, 813 (NY 2015) (quotations omitted) (holding that "the buyers' failure to timely pay the $███████ to the sellers was not a material breach, as it did not substantially defeat the purpose of the parties' agreements").

### 2. The Transaction Agreements Did Not "Self-Terminate" at 5:00 PM on Friday, July 31, 2020.

BNRV also maintains that they were free to sell the Properties and Dealerships to Camping World because, in their view, the Transaction Agreements with Campers Inn "self-terminated" at 5:00 p.m. on Friday, July 31, 2020.[200] This position of BNRV also runs contrary to a plain reading of the relevant provision of the APA, Section 9.1(c), which states, in pertinent part: "This Agreement *may* be terminated at any time: (c) *by any Party* if the Closing shall not have occurred by April 15, 2020, and the Party seeking termination is ready, willing and able to close and not in material default." Nowhere in the APA's termination provisions or elsewhere in the Transaction Documents does it state that the parties' obligations "self-terminate" if the transactions do not close by 5:00 p.m. on Friday, July 31, 2020.[201] As written, Section 9.1(c) requires a "Party" to terminate the Transaction Agreements, *and* the decision to terminate is "permissive" or

---

[200] Shields Dep., Vol. II, 11:1-11.
[201] *See* APA § 9.1(c).

discretionary, as shown by use of the word "may" in the provision.[202] As BNRV admits, BNRV did not inform Campers Inn that it was invoking the APA's termination provisions until Friday, August 7, 2020.[203] By this time, BNRV had committed multiple material breaches of the Transactions Agreements (*e.g.*, refusing to send in closing documents, agreeing in principle to sell the Properties and Dealerships to Camping World). BNRV therefore had no right to invoke Section 9.1(c) of the APA to terminate their obligations under the Transaction Agreements.

For the foregoing reasons, Campers Inn is entitled to summary judgment on its breach of contract claim against BNRV.

## V. CAMPERS INN IS ENTITLED TO A PERMANENT INJUNCTION ORDERING SPECIFIC PERFORMANCE OF THE TRANSACTION AGREEMENTS AND TRANSFER OF THE PROPERTIES AND DEALERSHIPS TO CAMPERS INN.

To remedy BNRV's breaches of the Transaction Agreements, Campers Inn is entitled to a permanent injunction ordering BNRV to specifically perform its obligations under the Transaction Agreements to convey the Properties and Dealerships to Campers Inn. This Court's Order would bind not only BNRV, but also Camping World, which has knowingly participated and conspired in the scheme to deny Campers Inn's legal and contractual rights to the Properties and Dealerships.

### A. Campers Inn Is Contractually Entitled to a Permanent Injunction Ordering Specific Performance.

Issuance of a permanent injunction ordering specific performance is appropriate here because it is the exact remedy Campers Inn and BNRV agreed to in the Transaction Agreements. In Section 10.7 of the APA, the parties agreed: "Each Party is . . . authorized to demand *specific performance* of this Agreement, and is entitled to . . . *permanent injunctive relief* . . . at any time when the other Party fails to comply with any of the provisions of this Agreement. . . ."[204] BNRV

---

[202] Shields Dep., Vol. II, 13:1-10.
[203] Shields Dep., Vol. II, 180:2-181:17, 184:10-185:7.
[204] APA § 10.7 (emphasis added).

also "irrevocably waive[d] any defense that it might have based on the adequacy of a remedy at law which might be asserted as a bar to such remedy of specific performance or injunctive relief."[205]

### B. Campers Inn Is Otherwise Legally Entitled to a Permanent Injunction Ordering Specific Performance.

Even absent BNRV's express agreement to the remedy of specific performance enforced by a permanent injunction, Campers Inn would still be entitled to this relief because it can prove each of the required elements for issuance of this remedial order. In deciding whether to grant a permanent injunction, this Court must consider whether: "(1) the moving party has shown actual success on the merits; (2) the moving party will be irreparably injured by the denial of injunctive relief; (3) the granting of permanent injunctive relief will result in greater harm to the defendant; and (4) the injunction would be in the public interest." *Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001). In deciding the propriety of specific performance, the Court's considerations are similar. Specifically, the Court must consider Campers Inn's success on the merits and whether Campers Inn has been irreparably harmed. *See Fallati v. Mackey*, 31 A.D.3d 879 (N.Y. App. Div. [3d Dep't] 2006) ("To obtain summary judgment for specific performance of a real estate contract, plaintiff must "demonstrate that [he] substantially performed [his] contractual obligations and [was] ready, willing and able to fulfill [his] remaining obligations, that defendant was able but unwilling to convey the property and that there is no adequate remedy at law.").[206] Because the undisputed facts establish that there is no genuine issue of material fact concerning Campers Inn's performance and BNRV's breach of their respective contractual obligations,[207] the focus below is

---

[205] *Id.*

[206] Like New York law, Pennsylvania's law of specific performance focuses on the issue of irreparable harm. *See Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 159 (3d Cir. 1999) ("Pennsylvania law conforms to the general rules regarding the availability of specific performance. 'Specific performance should only be granted . . . where no adequate remedy at law exists.'") (citing *Clark v. Pennsylvania State Police*, 436 A.2d 1383, 1385 (Pa. 1981)).

[207] *See* Section IV *supra*.

on the remaining elements: lack of an adequate remedy at law, balancing of the hardships, and the public interest.

### 1. Campers Inn Has No Adequate Remedy At Law.

Under the laws of both New York and Pennsylvania, specific performance in equity is an appropriate and routinely granted remedy to compel the conveyance of real estate where, as here, a seller violates a realty contract. *See Payne v. Clark*, 197 A.2d 769 (Pa. 1963) ("From the moment an agreement of sale of real estate is executed and delivered it vests in the grantee what is known as an equitable title to the real estate. Thereupon the vendor is considered as a trustee of the real estate for the purchaser and the latter becomes a trustee of the balance of the purchase money for the seller. Hence, if the terms of the agreement are violated by the [seller], [the purchaser] may go into a court of equity seeking to enforce the contract and to compel specific performance."); *Oliver v. Ball*, 136 A.3d 162, 167 (Pa. Super. 2016) ("Courts in this Commonwealth consistently have determined that specific performance is an appropriate remedy to compel the conveyance of real estate where a seller violates a realty contract[.]"); *Radiant Realty Co. v. Sheinbaum*, 171 N.Y.S.2d 252 (NY Sup. Ct. 1958) ("The normal remedy for breach of an agreement to sell real property is specific performance[.]"); Restatement (Second) of Contracts § 360 cmt. (e) ("Contracts for the sale of land have traditionally been accorded a special place in the law of specific performance. A specific tract of land has long been regarded as unique and impossible of duplication by the use of any amount of money.").

The remedy of specific performance is particularly appropriate here because the Properties possess unique properties that make them particularly desirable locations for RV dealerships. In the Offering Materials BNRV marketed to Campers Inn and its competitors, BNRV emphasized that the Properties are " ████████████████████████████████████ ████████████████████████████ " and that they had " ████████████ " with an " ████████

██████" in excess of "████████████."[208] BNRV further emphasized that both locations provided plenty of space for expansion and development.[209] BNRV has not adduced any evidence in this case of there being any properties comparable to the NY and PA Properties. And, as evidenced by this litigation and BNRV's unlawful sale to Camping World, both Properties are coveted by RV dealers. Because there is no adequate or complete remedy for BNRV's breach other than transfer to Campers Inn of the Properties and Dealerships themselves, Campers Inn has suffered irreparable harm necessary for issuance of a permanent injunction ordering specific performance. *See Allegheny Energy v. DQE, Inc.*, 171 F.3d 153, 160 (3d Cir. 1999) ("The mere fact that a remedy at law exists is not sufficient to oust equitable jurisdiction; the question is whether the remedy is adequate or complete.") (citations and quotations omitted).

### 2. BNRV Would Not Suffer Any Harm – Other than Self-Inflicted Harm – from Issuance of a Permanent Injunction.

Issuance of a permanent injunction ordering specific performance of BNRV's contractual obligation to convey the Properties and Dealerships to Campers Inn will not cause BNRV any harm. The Order will result only in BNRV doing what it contractually agreed to do: transfer the Properties and Dealerships to Campers Inn in exchange for an agreed upon purchase price. Following the damages phase of this case, BNRV may be required to compensate Campers Inn for the profits Campers Inn has lost from operating the Dealerships since the date of BNRV's breach and BNRV may also have to indemnify Camping World for its losses pursuant to their agreements. But these losses to BNRV would be the self-inflicted result of their unlawful double-dealing of the Properties and Dealerships and, therefore, irrelevant. *Cottman Transmission Systems, LLC v. Gano*, 2103 WL 842709, at *6 (E.D. Pa. Mar. 7, 2013) ("The balance of the hardships also weighs in favor of granting the injunction, as any detriment suffered by the Defendants due to the

---

[208] Ex. D84 at 8.
[209] *Id.* at 11, 16.

injunction would be self-inflicted harm."); *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) ("[T]he injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought the injury upon itself.").

### 3. The Public Interest Favors Enforcing Contracts and Disfavors Double-Dealing.

Issuance of a permanent injunction ordering specific performance of BNRV's obligation to convey the properties to Campers Inn pursuant to the Transaction Agreements is in the public interest because the Court would be enforcing a valid contract and undoing BNRV's deceptive and unlawful double-dealing of the Properties and Dealerships. *URL Pharma, Inc. v. Reckitt Benckiser, Inc.*, 2016 WL 1592695, at *13 (E.D. Pa. Apr. 20, 2016) ("[T]he public interest favors enforcing valid contracts and making parties live up to their agreements.") (citation and quotations omitted). *Kerr-McGee Chemical Corp. v. City of West Chicago*, 732 F. Supp. 922, 929 (N.D. Ill. 1990) ("[T]he public interest certainly would not be served if this court were to countenance Kerr-McGee's apparent double-dealing[.]").

### C. BNRV's Unlawful and Deceptive Double-Dealing of The Properties and Dealerships Can, and Must Be, Unwound.

BNRV's unlawful and deceptive sale of the Properties and Dealerships to Camping World *while this litigation and Campers Inn's Motion for Preliminary Injunction demanding specific performance of the Transaction Agreements were pending before this Court and after Campers Inn filed a notice of lis pendens on the Properties* does *not* diminish in any way Campers Inn's right to the Properties and Dealerships. Were the law otherwise, no good faith purchaser of real estate would ever have any certainty of obtaining the benefit of their bargain because of scheming by bad faith sellers to obtain a higher price from another buyer before closing.

The law, of course, does not countenance such bad faith double-dealing. Both New York

and Pennsylvania hold that this Court can, and should, unwind sales of real estate to subsequent purchasers who take property with either actual or constructive notice of a prior purchaser's interest in the property. *See, e.g.*, N.Y. C.P.L.R. 6501 ("A person whose conveyance . . . is recorded after the filing of the [notice of pendency (*i.e.*, *lis pendens*)] is bound by all proceedings taken in the action after such filing to the same extent as a party."); *Burkhart v. George*, 228 A.D.2d 536 (N.Y. App. Div. [2nd Dep't] 1996) (nullifying sale of property and holding that appellant-purchaser was not a bona fide purchaser for value where he "acquired title to the subject property and recorded his deed after the plaintiffs filed a *lis pendens* on that property and commenced an action"); *Morrocoy Marina, Inc. v. Altengarten*, 120 A.D.2d 500 (N.Y. App. Div. [2nd Dep't.] 1986) ("Defendants have failed to show any reason why plaintiff should not be awarded specific performance; plaintiff has shown readiness and willingness to perform its obligations under contract and fact that property has been conveyed to defendant third party, who was not party to original contract, does not, under circumstances, render specific performance impossible remedy."); *Kohl v. PNC Bank Nat'l Ass'n*, 912 A.2d 237, 242 n.6 (Pa. 2006) (emphasis added) (stating that a *lis pendens* puts third parties on notice that any interest that they "may acquire in the properties pending the litigation will be subject to the result of the action"); *Frankel v. Ne. Land Co.*, 570 A.2d 1065, 1068 (Pa. Super. 1990) ("A party who purchases real estate with notice that his grantor has a prior obligation to convey to another is subject to an action for specific performance by a prior purchaser."); *Long John Silvers, Inc. v. Fiore*, 386 A.2d 569, 573 (Pa. Super. 1978) ("If the subsequent purchaser has notice of the first agreement of sale or deed, he has no protection as a bona fide purchaser and his title is subject to the interest vested in the first purchaser. Either actual or constructive notice is sufficient to prevent the subsequent purchaser from acquiring the status of a bona fide purchaser.").

There is no dispute that BNRV sold and Camping World purchased the Properties with

43

both constructive and actual notice of Campers Inn's superior interest in them. Even before Campers Inn filed its Counterclaim, Motion for Preliminary Injunction, and Notice of *Lis Pendens* on August 25, 2020, BNRV and Camping World had discussed and incorporated into their agreements the risk that Campers Inn would seek to enforce its right to the Properties through an injunction.[210] Moreover, Camping World admits that "Camping World entered a deal with the Littlefield Parties to purchase the properties and dealerships in Berks County, Pennsylvania and Greene County, New York with knowledge of pending litigation between the Littlefield Parties and Campers Inn, including a motion for preliminary injunction, and *lis pendens* indexed against the properties."[211] Because BNRV sold and Camping World purchased the Properties with full and complete knowledge of Campers Inn's superior claim to them, the Court can, and should, issue a permanent injunction, ordering the unwinding of their transactions and conveyance of the Properties and Dealerships to Campers Inn.

That Camping World is not a party to this action is of no consequence to this Court's power and authority to order and compel the unwinding of BNRV's transactions with Camping World and conveyance of the Properties and Dealerships to Campers Inn. Under Rule 65, this Court's injunction order would bind not only BNRV, but also Camping World, which has knowingly participated in a scheme to deprive Campers Inn of the Properties and Dealerships knowing that Campers Inn has a superior claim to them. *See* Fed. R. Civ. P. 65(d)(2)(C) (stating that injunction orders "bind[] . . . other persons who are in active concert or participation with anyone" subject to an injunction order); *Gambone v. Lite Rock Drywall*, 288 Fed.Appx. 9, 12 (3d Cir. 2008) ("[A]ncillary jurisdiction lets prevailing litigants go to the District Court that entered judgment for

---

[210] *See, e.g.,* Ex. D70 (Camping World's Lemonis stating to Littlefield on August 17, 2020: "█████████████████████████████████ ████████████████████████.").

[211] **Exhibit D107** (Camping World's Answer and New Matter to Plaintiffs' Complaint in the matter *Campers Inn Holding Corporation et al. v. Camping World Holdings, Inc. et al.*, Phila. C.C.P. No. 210601138) ¶ 49.

help in resolving matters related to its enforcement."); *ABI Jaoudi and Azar Trading Corp. v. CIGNA Worldwide Ins. Co.*, 2016 WL 3959078, at *14 (E.D. Pa. July 22, 2016) (holding that the court was within its power to enforce injunction against non-parties based on its inherent powers to enforce its judgments). *See also Golden State Bottling Co. v. N.L.R.B.*, 414 U.S. 168, 179 (1973) ("Persons acquiring an interest in property that is a subject of litigation are bound by, or entitled to the benefit of, a subsequent judgment, despite a lack of knowledge."); *Autotech Techs. LP v. Integral Research & Dev. Corp.*, 499 F.3d 737, 744 (7th Cir. 2007) ("Once a court is entitled to exercise subject matter jurisdiction over the suit, it has the full panoply of powers necessary to bring that suit to resolution and to enforce whatever judgments it has entered."); *In re Linerboard Antitrust Litig.*, 361 Fed.Appx. 392, 396 (3d Cir. 2010) (pursuant to All Writs Act, 28 U.S.C. § 1651(a), courts have power to enter and enforce injunctions even over non-parties "who are in a position to frustrate the implementation of a court order or the proper administration of justice.").

In sum, the undisputed facts and controlling law support this Court's issuance of a permanent injunction ordering the unwinding of the transaction between BNRV and Camping World and conveyance of the Properties and Dealerships to Campers Inn.[212]

## VI.  CAMPERS INN IS ENTITLED TO SUMMARY JUDGMENT ON BNRV'S CLAIMS.

### A.  The Undisputed Facts Show That Campers Inn Did Not Breach the Transaction Agreements.

BNRV alleges that Campers Inn breached the Transaction Agreements by:

1.  "failing promptly to obtain surveys and other necessary materials to proceed to

---

[212] As set forth in the Proposed Order Granting Summary Judgment to Campers Inn, Campers Inn respectfully requests that the Court order Campers Inn only to pay into an escrow account the purchase price of $████████ . Following the damages phase of this trial, Campers Inn estimates that BNRV will be found liable for lost profits, costs, and attorneys' fees in excess of the purchase price stated in the Transaction Agreements, which, for efficiency's sake and to avoid unnecessary credit exposure to BNRV, should be netted against the purchase price payment. Campers Inn's concern about credit exposure to BNRV is well-founded, as BNRV also faces significant exposure to Camping World, including potential demands for return of the $████████ purchase price Camping World paid for the Properties and Camping World's costs and attorneys' fees. *See* Exs. D-76 §§ 3, 9, D-77 § 3.

45

closing in a timely fashion";

2.  "failing to identify, within a commercially reasonable time, the vendors they would use to complete the work necessary to proceed to the closing of the real estate sale";

3.  "failing to work in good faith to close the transaction in a timely fashion" and "failing to close the real estate sale by the deadline of 5:00 p.m. on July 31, 2020"; and

4.  "objecting to the transmittal of the deposit to [BNRV] after the deal failed to close by 5:00 p.m. on July 31, 2020."[213]

For the reasons stated below and in Campers Inn's to-be-filed Brief in Opposition to BNRV's Motion for Summary Judgment, none of these allegations are supported by the facts or the law. Campers Inn is therefore entitled to entry of summary judgment in its favor on BNRV's breach of contract claim (Count I of the Complaint).

### 1.  Campers Inn Promptly Ordered Surveys and Obtained Them Before July 31, 2020.

As a preliminary matter, Section 3(e) of the Addendum required only that Campers Inn "promptly order[]" surveys; there is no requirement in the Transaction Agreements that the surveys be "promptly . . . obtain[ed]," as BNRV alleges.[214] Indeed, Section 3(e) of the Addendum expressly contemplates that the surveys might "not [be] obtained on or prior to the Closing Date" even if they were "promptly ordered."[215] All the same, there is no dispute that Campers Inn obtained surveys of the Properties before July 31, 2020.[216] And BNRV admits that they suffered no harm from the timing of the completion of the surveys.[217]

As for whether they were ordered "promptly," Littlefield, who has, himself, obtained

---

[213] Complaint (ECF No. 1) ¶ 84.
[214] Addendum § 3(e).
[215] *Id.*; Shields Dep., Vol. I, 135:20-136:14 (admitting same).
[216] **Exhibit D40** (PA Property survey), **Exhibit D42** (NY Property survey); Jeppsen Dep. 266:24-267:12, 269:8-25 (testifying to delivery of both surveys on July 28, 2020); Shields Dep., Vol. II, 89:15-23 (admitting that BNRV's allegation of breach is limited to whether the surveys were ordered promptly enough, not that the surveys were not ultimately delivered before July 31, 2020).
[217] Shields Dep., Vol. II, 77:21-78:7.

46

surveys of the Properties in the past in order to obtain mortgage financing, testified that surveys of the Properties could be done "*in less than a week*."[218] The undisputed evidence shows that Campers Inn reached out to survey companies in June 2020 once the stay-at-home orders in New York and Pennsylvania lifted and had surveyors under contract by July 1, 2020 – thirty days before the contemplated closing date of July 31, 2020.[219] There is no evidence in the record developed in discovery of survey companies who were available to conduct the surveys prior to July 1, 2020. Indeed, despite is alleged concern over the ordering of surveys, BNRV never contacted any surveyors about their availability to survey the properties and did not provide Campers Inn with the prior surveys of the Properties until the beginning of July 2020.[220]

BNRV's argument in support of this allegation of breach rests on a self-serving definition of "promptly" developed *post hac* and which is willfully blind to the business disruptions wrought by the COVID-19 pandemic.[221] Littlefield testified that "promptly" means the surveys should have been ordered by "April 27th" and Shields testified that "promptly" means that the surveys should have been ordered "immediately" or "no less than seven days following execution of the Addendum."[222] But BNRV concedes the Addendum only says "promptly," and that nobody affiliated with BNRV ever told Campers Inn what BNRV supposedly believed "promptly" to mean.[223] And BNRV can offer no evidence of any survey companies who were open and available during the heart of the COVID-19 business and government shutdown orders. Further undermining this allegation of breach is the fact that BNRV never complained to Campers Inn about the timeliness or promptness of its ordering of surveys until it filed the Complaint initiating this litigation, by which time BNRV had a signed term sheet with Camping World for a deal offering

---

[218] Littlefield Dep., Vol. I, 224:6-8 (emphasis added).
[219] Exs. D34, D35.
[220] Shields Dep., Vol. I, 126:12-127:21.
[221] *See* Section II(C) *supra.*
[222] Littlefield Dep., Vol. I, 218:8-219:13; Shields Dep., Vol, I, 124:4-20.
[223] Shields Dep., Vol. I, 124:1-125:5.

it $1.5 million more for the same properties.[224]

### 2.      Campers Inn Met Its Contractual Obligation to Identify Vendors.

BNRV's allegation that Campers Inn breached the Transaction Agreements by "failing to identify, within a commercially reasonable time, the vendors they would use to complete the work necessary to proceed to the closing of the real estate sale" is also meritless. Section 3(e) of the Addendum states only: "Buyer shall identify to Seller the vendor(s) chosen by Buyer to perform such work [*i.e.*, title work and surveys] in New York and Pennsylvania, respectively." This provision, which BNRV drafted, does not designate a time *when* Campers Inn was to have identified the vendors to BNRV.[225] Nevertheless, it is undisputed that Campers Inn identified and provided to BNRV the contact information for its title work and survey vendors on July 24, 2020 and that BNRV never complained about this information being untimely until it did so *post hac* in its Complaint.[226] Moreover, other than the fact that the transactions did not ultimately close on July 31, 2020, BNRV cannot identify any harm from Campers Inn's not identifying its vendors of title and survey work until July 24, 2020.[227]

### 3.      Campers Inn Was Ready, Willing, and Able to Close on July 31, 2020, and Thereafter.

BNRV's allegations that Campers Inn breached the Transaction Agreements because it allegedly did not work "in good faith" toward closing and the transactions did not close by 5:00 p.m. on Friday, July 31, 2020, are fallacious and wrong for the reasons set forth in Section IV(D) above. They are also incredulous given Littlefield's: (a) pre-closing discussions with Camping World in violation of the APA's No Shop provision; (b) decision to shut down any further dealings with Campers Inn on the afternoon of Friday, July 31, 2020 when only "a few minor items"

---

[224] Shields Dep., Vol. II, 102:23-103:14.
[225] Shields Dep., Vol. I, 130:13-131:14.
[226] Shields Dep., Vol. II, 64:8-66:10; **Exhibit P-209**.
[227] Shields Dep., Vol. I, 132:2-21.

remained to be done for the deals to close and for him to receive $██████████; and (c) negotiation of a deal with Camping World for $1.5 million more over the following weekend. Littlefield did all of these things without informing Campers Inn of his intention to proceed no further with Campers Inn and to pursue a deal with Camping World instead. Moreover, given that Campers Inn was ready, willing, and able to proceed to closing and BNRV was not, Campers Inn's refusal to release its $750,000 held in escrow to BNRV was entirely appropriate.

Because the undisputed facts show that Campers Inn performed its pre-closing obligations, none of BNRV's allegations of breach have merit and Campers Inn is entitled to summary judgment in its favor.

### B. Campers Inn Is Entitled to Summary Judgment on BNRV's Alternative Claim for Declaratory Judgment (Count II).

BNRV's alternatively pled claim for declaratory judgment (Count II) seeks the same relief as its breach of contract claim (Count I), specifically, a judicial determination that Campers Inn breached the Transaction Agreements thus entitling BNRV to the $750,000 held in escrow and its fees and costs. The Third Circuit has held that for declaratory judgments to avoid dismissal, they must "have utility" and "be of significant practical help in ending the controversy." *Step-Saver Data Sys., v. Wyse Tech.*, 912 F.2d 643, 650 (3d Cir. 1990). Where, as here, claims for declaratory judgment are duplicative of breach of contract claims, however, they should be dismissed. *State Auto Ins. Co. v. Summy*, 234 F.3d 131, 134-35 (3d Cir. 2000). Because BNRV's declaratory judgment claim is entirely duplicative of its breach of contract claim, Campers Inn should be granted summary judgment in its favor and the Court should dismiss Count II of the Complaint on this basis alone. Alternatively, Campers Inn should be granted summary judgment in its favor on BNRV's declaratory judgment claim for the same reasons it should be granted summary judgment on BNRV's breach of contract claim (Count I).

C.     **Campers Inn Is Entitled to Summary Judgment on BNRV's Alternative Claim for Promissory Estoppel (Count III).**

Like BNRV's alternative declaratory judgment claim, its alternatively pled claim for promissory estoppel (Count III) is impermissibly duplicative of BNRV's breach of contract claim (Count I). *Gas Natural, Inc. v. Iberdrola, S.A.*, 33 F.Supp.3d 373, 386 (S.D.N.Y. 2014) (holding under New York law that promissory estoppel claims that are duplicative of breach of contract claims must be dismissed); *Carlson v. Arnot-Ogden Mem. Hosp.*, 918 F.2d 411, 416 (3d Cir. 1990) (holding that, while claims for breach of contract and promissory estoppel may be pleaded in the alternative under Pennsylvania law, if a contract exists, the promissory estoppel claim must fail). Accordingly, Campers Inn is entitled to summary judgment on Count III of the Complaint for this reason alone or, alternatively, for the reasons stated in Section IV(A) above.

## VII.   <u>CONCLUSION.</u>

For the foregoing reasons, Campers Inn respectfully requests that the Court enter summary judgment in its favor on its breach of contract claim and that it issue a permanent injunction ordering specific performance of BNRV's contractual obligation to convey the Properties and Dealerships to Campers Inn. Campers Inn further requests that the Court grant summary judgment in its favor on Counts I (breach of contract), II (declaratory judgment), and III (promissory estoppel) of BNRV's Complaint. A proposed order is enclosed with Campers Inn's Motion.

Respectfully submitted,

**BLANK ROME LLP**

*/s/ James T. Smith*

James T. Smith
William R. Cruse
Danielle Catalan
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Telephone:     (215) 569-5500
Facsimile:      (215) 569-5555

*Attorneys for Defendants/Counterclaim-
Plaintiffs Campers Inn Holding
Corporation, CI of Hamburg, LLC and CI of
West Coxsackie, LLC*

51

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DONOVAN REALTY, LLC, DD&A TILDEN REALTY, LLC, ZERTECK, INC., TILDEN RECREATIONAL VEHICLES, INC., and DERWOOD L. LITTLEFIELD,<br><br>Plaintiffs/Counterclaim-Defendants,<br><br>v.<br><br>CAMPERS INN HOLDING CORPORATION, CI OF HAMBURG, LLC, and CI OF WEST COXSACKIE, LLC,<br><br>Defendants/Counterclaim-Plaintiffs, | :<br>:<br>:<br>:<br>:<br>:     Case No. 2:20-cv-03954-CMR<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

**[PROPOSED] ORDER**

AND NOW, this _____ day of _____, 2022, upon consideration of the Motion for Summary Judgment by Defendants/Counterclaim-Plaintiffs Campers Inn Holding Corporation, CI of Hamburg, LLC, and CI of West Coxsackie, LLC (collectively, "Campers Inn"), and any response thereto, it is hereby **ORDERED** that the Motion is **GRANTED**, and judgment is entered in favor of Campers Inn and against Plaintiffs/Counterclaim-Defendants Donovan Realty, LLC, DD&A Tilden Realty, LLC, Zerteck, Inc., Tilden Recreational Vehicles, Inc., and Derwood L. Littlefield (collectively, "BNRV") on: Campers Inn's Counterclaim for Breach of Contract, BNRV's claim for breach of contract (Complaint, Count I), BNRV's claim for declaratory judgment (Complaint, Count II), and BNRV's claim for promissory estoppel (Complaint, Count III).

It is further declared that, pursuant to Rule 65 of the Federal Rules of Civil, Campers Inn, BNRV and, upon receipt of notice of this **ORDER**, all other persons acting in concert or participating with BNRV, including, without limitation, Camping World Holdings, Inc., FRHP

1

Lincolnshire, LLC, and Meyer's RV Center, LLC (collectively, "Camping World"), are **ENJOINED** and **ORDERED** to perform all actions necessary within the next thirty (30) days to specifically perform BNRV's contractual obligation to convey and Campers Inn's contractual obligation to purchase the properties and dealerships that are the subject matter of the Asset Purchase Agreement ("APA") and Agreement for Purchase and Sale of Real Estate and Related Property ("REPA"), dated February 4, 2020, as amended by the First Addendum to Asset Purchase Agreement and Purchase and Sale Agreement (the "Addendum"), dated April 24, 2020, including, but not limited to, performance of the obligations set forth in Section 7.2 of the APA and Section 10 of the REPA.

It is further **ORDERED** that Campers Inn's payment of the purchase price set forth in Section 1.4 of the APA, as modified by Section 3(b) of the Addendum, is to be placed in an escrow account managed by an escrow agent mutually agreeable to the parties pending this Court's resolution and determination of the damages phase of this case and entry of final judgment, after which time Campers Inn's purchase price payment to BNRV will be netted against any damages awarded to Campers Inn.

Trial of the damages phase of this action is scheduled for _____.

SO ORDERED:

_____
HON. CYNTHIA M. RUFE U.S.D.J.

Dated:

2

## CERTIFICATE OF SERVICE

I, William R. Cruse, certify that I directed Defendants/Counterclaim-Plaintiffs' Motion for Summary Judgment, Proposed Order, Memorandum of Law, and supporting exhibits to be served on all counsel of record via the Court's electronic filing system and email.

Dated: April 28, 2022.

*/s/ William R. Cruse*