**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **DONOVAN REALTY, LLC,** *et al.* | |
| **Plaintiffs/Counterclaim Defendants,** | **CIVIL ACTION NO. 20-3954** |
| **v.** | |
| **CAMPERS INN HOLDING CORP.,** *et al.* | |
| **Defendants/Counterclaim Plaintiffs.** | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Rufe, J.                                                                        May 13, 2024

The case arises out of a failed transaction for the sale of real estate and recreational vehicle ("RV") dealerships: the "Boat N RV Superstore" in Hamburg, Pennsylvania and the "Boat N RV Warehouse" in West Coxsackie, New York. Plaintiffs/Counterclaim Defendants Donovan Realty, LLC, DD&A Tilden Realty, LLC, Zerteck, Inc., Tilden Recreational Vehicles, Inc., and Derwood L. ("Don") Littlefield (collectively, "BNRV") agreed to sell the RV sales and service operations and the land to Defendants/Counterclaim Plaintiffs Campers Inn Holding Corporation, CI of Hamburg LLC, and CI of West Coxsackie, LLC (collectively, "Campers Inn").[1] The transaction did not close and BNRV later sold the properties and dealerships to non-party Camping World Holdings, Inc. and associated entities.

BNRV filed this lawsuit on August 13, 2020, asserting a breach of contract claim and seeking the $750,000 deposit and counsel fees; a declaratory judgment that because the real estate transaction did not close by July 31, 2020, the parties' agreements terminated, entitling

---

[1] Different entities were involved as to each property; the Court will refer to the collective groups unless specificity is necessary.

BNRV to the deposit; and, in the alternative, promissory estoppel based on BNRV's reliance on promises made by Campers Inn.[2]

On August 25, 2020, Campers Inn answered the Complaint and asserted a counterclaim for breach of contract, seeking damages and an injunction ordering specific performance.[3] Campers Inn also filed a motion for a preliminary injunction[4] and a notice of *lis pendens*.[5] On October 9, 2020, BNRV closed the sale of the dealerships and real estate to non-party Camping World and no longer holds title to the properties. After extensive discovery and pretrial proceedings,[6] the Court heard evidence and the arguments of counsel during a nine-day non-jury trial. The Court now enters the following findings of fact in paragraph form and conclusions of law in discussion form pursuant to Federal Rule of Civil Procedure 52(a).[7]

## I.   FINDINGS OF FACT[8]

1.      In 2019, BNRV engaged a broker, Haig Partners, to confidentially market the sale of

---

[2] *See generally* Compl. [Doc. No. 1].

[3] Campers Inn Ans. & Countercl. [Doc. No. 8].

[4] Campers Inn sought an order directing BNRV to "[c]ease and desist all efforts to solicit, discuss, and/or negotiate the transfer or sale of their recreational vehicle businesses and accompanying real estate to any other party other than [Campers Inn]; and "[s]pecifically perform their contractual obligations under the [parties' agreements], as amended by the Addendum, to convey to [Campers Inn] the subject properties." Campers Inn Mot. Prelim. Inj. Proposed Order [Doc. No. 9-2] at 3. By Memorandum and Order dated November 10, 2021, the Honorable Petrese Tucker, to whom this case was then assigned, denied a motion for partial judgment on the pleadings and also denied the motion for preliminary injunction as moot because the properties had been sold.

[5] Campers Inn Notice *Lis Pendens* [Doc. No. 11]. The purpose of a notice of *lis pendens* is to "to warn all persons that certain property is the subject matter of litigation, and that any interests acquired during the pendency of the suit must be subject to the outcome of the litigation." Bryan A. Garner, *A Dictionary of Modern Legal Usage* at 530 (2d ed. 1995).

[6] The case was reassigned to the docket of this Court on March 15, 2022. Order Mar. 15, 2022 [Doc. No. 61].

[7] To the extent not expressly ruled upon herein, any claims raised by the parties have been denied.

[8] In determining the facts, the Court has considered the parties' exhibits and the testimony of the witnesses, as well as the reasonable inferences to be drawn therefrom. In evaluating the credibility of a witness, the Court has considered factors including the demeanor of the witness, the interest that the witness may have in the outcome of the case, and the ability of the witness to know and remember the facts to which the witness testified.

four dealerships, including the New York and Pennsylvania locations.[9]

2.      Haig Partners produced offering materials to attract potential buyers.[10]

3.      BNRV also ordered and paid for appraisals by Cushman & Wakefield in 2019.[11]

4.      On February 4, 2020, BNRV and Campers Inn entered into an asset purchase agreement (the "APA")[12] governing the sale of the dealership assets for the New York and Pennsylvania locations, and an agreement for the purchase and sale of the real estate and related property (the "RPA").[13]

5.      The RPA incorporates the provisions of the APA, "except to the extent that the provisions of [the RPA] are inconsistent with the terms and conditions of the [APA], in which case, the terms and conditions of [the RPA] shall control."[14]

6.      The total purchase price was to be $17,317,500.[15]

7.      BNRV was represented by Thomas Shields, who was at the time in-house counsel.[16]

8.      Don Littlefield, the founder of the business, was the decision-maker for BNRV.[17]

9.      Campers Inn was represented by Hamilton Traylor of Fisher, Tousey, Leas & Ball in Jacksonville, Florida.[18]

---

[9] Trial Tr. Dec. 4, 2023 [Doc. No. 173] at 52-53.

[10] Ex. J-004.

[11] Trial Tr. Dec. 4, 2023 [Doc. No. 173] at 2.

[12] Ex. J-001 (hereinafter cited as "APA").

[13] Ex. J-002 (hereinafter cited as "RPA").

[14] RPA § 1(b).

[15] APA § 1.4(a).

[16] Trial Tr. Dec. 4, 2023 [Doc. No. 173] at 53.

[17] Trial Tr. Dec. 4, 2023 [Doc. No. 173] at 53–54.

[18] Trial Tr. Dec. 12, 2023 [Doc. No. 177] at 32–33; 60–61; 182.

10.    CEO Jeffrey Hirsh was the decision maker for Campers Inn.[19]

11.    The agreements by their terms are governed by New York law.[20]

12.    The APA included a "no shop" provision under which BNRV agreed not to directly or indirectly "consider, discuss or negotiate with, or solicit, initiate or encourage the transfer or sale" of the dealerships and land and to notify Campers Inn of any offers received.[21]

13.    The "no shop" provision was to terminate on the earlier of the closing date or upon termination of the agreement.[22]

14.    The APA included a confidentiality provision as to "all information obtained from Buyer or Seller in connection with the Transactions . . . ."[23]

15.    The APA required Campers Inn to put $250,000 in escrow, payable either as part of the purchase price, or, if BNRV was ready, willing, and able to consummate the transactions but Campers Inn failed to do so, then the deposit would be retained by BNRV as liquidated damages and the APA would be "null and void and neither party shall have any rights or obligations under" the APA.[24]

16.    The APA also provided that in the event of a breach, the non-breaching party would be "authorized to demand specific performance" of the APA and RPA and entitled to "permanent injunctive relief."[25]

---

[19] Trial Tr. Dec. 11, 2023 [Doc. No. 176] at 112.

[20] APA § 10.5; RPA § 15(b).

[21] APA § 4.3.

[22] APA § 4.3.

[23] APA § 4.1.

[24] APA § 9.2.

[25] APA § 10.7.

17. The APA required BNRV to remove certain inventory from the properties, including all marine products and parts.[26]

18. Section 7.1 of the APA set forth the original date for the closing and provided:

> **TIME, DATE, AND PLACE OF CLOSING**. The Closing of the Transactions (the "Closing") shall take place five (5) business days after notice by Buyer to Seller that the conditions to close pursuant to Sections 6.1(d), 6.l(g), and 6.l(h) have been satisfied or as otherwise mutually agreeable to the Parties; *provided, however,* that the Closing shall take place on or before April 15, 2020 (the date on which the Closing actually occurs is hereinafter referred to as the "***Closing Date***"), time being of the essence. Subject to the consummation of the Closing on the Closing Date, the sale, assignment, transfer and conveyance to Buyer of the Purchased Assets will be deemed effective as of close of business on the Closing Date.[27]

19. BNRV's required deliveries at closing were:

> (i) a bill of sale in the form acceptable to the Buyer;
> (ii) possession and control of[] all of the Purchased Assets;
> (iii) all documents or other material required to be delivered by Seller pursuant to this Agreement (the "***Transaction Documents***");
> (iv) consent of the stockholders of each Seller approving the execution, delivery, and performance of this Agreement; []
> (v) such other documents as may be reasonably necessary to consummate the Transactions as reasonably requested by Buyer or its counsel[;][28]
> [vi] a Warranty Deed subject only to Permitted Exceptions and zoning, building and other similar restrictions affecting the Property;
> [vii] a Bill of Sale and an Assignment and Assumption Agreement transferring all fixtures, transferable warranties, service agreements, permits, licenses, authorizations, and development rights related to the Property, to the extent they are assignable and Buyer elects to receive an assignment thereof;
> [viii] a Section 1445 Affidavit regarding Seller's status under the Foreign Investment in Real Property Tax Act;
> [ix] an Affidavit as to construction liens and possession in a form acceptable to the Title Company to delete exceptions for liens and parties in possession;
> [x] a Proration Agreement in accordance with Section 11 below;
> [xi] a Settlement Statement;
> [xii] full, complete and exclusive possession of the Property, subject only to

---

[26] APA § 1.2(d); Trial Tr. Dec. 12, 2023 [Doc. No. 177] at 49–50.

[27] APA § 7.1.

[28] APA § 7.2(a).

the Permitted Exceptions; and

[xiii] such other documents as may be reasonably required by this Agreement or may be requested by the Title Company and that are not inconsistent with the provisions of this Agreement.[29]

20.     Campers Inn's required deliveries at closing were:

(i) consent of the directors of Buyer approving the execution, delivery, and performance of this Agreement;

(ii) the Purchase Price *less* the Assumed Liabilities and the principal amount of the Buyer Note, including, without limitation, the Seller's Floor Plan Finance Facility;

(iii) the Buyer's Note;

(iv) evidence that Buyer has assumed the obligations under the Seller's Dealer Agreements; []

(v) such other documents as may be reasonably necessary to consummate the Transactions as reasonably requested by Seller or its counsel[;][30]

[vi] a Bill of Sale and an Assignment and Assumption Agreement transferring all fixtures, transferable warranties, service agreements, permits, licenses, authorizations, and development rights related to the Property, to the extent they are assignable and Buyer elects to receive an assignment thereof;

[vii] a Proration Agreement in accordance with Section 11 below;

[viii] a Settlement Statement; and

[ix] such other documents as may be reasonably required by this Agreement or may be requested by the Title Company and that are not inconsistent with the provisions of this Agreement.[31]

21.     The parties had due diligence obligations under the Agreements, including that BNRV would deliver in its possession surveys, the title insurance policy, and similar documents.[32]

---

[29] RPA § 10(a).

[30] APA § 7.2(b).

[31] RPA § 10(b).

[32] Specifically, under the RPA, BNRV agreed to produce:
(a) copies of any existing surveys prepared by any survey or engineering company, if any, as well as any of the most recent title insurance policy or commitment for title insurance with respect to the Property;
(b) all existing soil reports, boundary and/or improvement surveys, and other similar materials relating to the Property; together with all physical inspection, engineering, and test reports, including, but not limited to environmental reports, and written investigations or assessments with respect thereto;

22.     BNRV also agreed to convey at closing "marketable fee simple title of record to the Land and Improvements to [Campers Inn] by a recordable warranty deed . . . in a form reasonably acceptable to [Campers Inn] and the Title Insurer . . . ."[33]

23.     BNRV further agreed to produce "additional instruments of transfer, conveyance and assignment" reasonably requested by Campers Inn.[34]

24.     The RPA provided that if the closing was to be an escrow or mail-away closing, rather than a closing with all relevant parties together in the same location, "all required documents and funds must be received" by the title insurer "at least one (1) business day prior to the scheduled Closing Date."[35]

25.     On March 1, 2020, Campers Inn, DD&A, and Donovan Realty entered into a Deferred Maintenance Agreement, wherein Campers Inn agreed to accept the properties in as-in condition with a price reduction of $342,605 for deferred maintenance, an agreement that all conditions precedent to Seller's performance had been satisfied, and that the due diligence period ended four days early.[36]

26.     M&T Bank, which was funding the transactions, notified Campers Inn on March 5, 2020, that M&T Bank required surveys of the properties.[37]

---

(c) copies of any unrecorded agreements made by Seller relating to the Property which will survive the Closing under this Agreement, and any current notices which Seller has received from any governmental entities regarding the Property;
(d) a copy of the most recent appraisal of the Property;
(e) any pertinent available plans, drawings or specifications with respect to the improvements which are currently located on the Property; and
(f) any other items deemed reasonably necessary by Buyer to conduct inspection[.]
RPA § 4.

[33] RPA § 5(d).

[34] APA § 4.16.

[35] RPA § 9.

[36] Ex. P-66; Trial Tr. Dec. 11, 2023 [Doc. No. 176] at 118–20.

[37] Trial Tr. Dec. 12, 2023 [Doc. No. 177] at 84–85.

27. Campers Inn did not obtain surveys of the properties before March 5, 2020, but doing so was not required under the agreements.[38]

28. Campers Inn asked BNRV to announce the sale publicly, which was done on March 9, 2020.[39]

29. The APA provided that "all conditions precedent to [Campers Inn's] performance shall be deemed satisfied in the event [Campers Inn] authorizes any public announcement of the Transactions by [BNRV's agent] or the commencement of any operations by [Campers Inn] at the Properties, including operations utilizing [BNRV's] employees."[40]

30. Such a public announcement affected BNRV's relationship with vendors, employees, and customers.[41]

31. At the beginning of April, Campers Inn advised BNRV that it was not prepared to close on April 15, 2020.[42]

32. Benjamin Hirsch, the Chief Operating Officer of Campers Inn, testified that the COVID-19 pandemic had adversely affected the RV market given the mandatory shutdowns in place.[43]

33. On April 24, 2020, the parties executed an Addendum, which recited in the third "Whereas" clause that "Buyer is unable to close on the scheduled date due to the fact

---

[38] Trial Tr. Dec. 12, 2023 [Doc. No. 177] at 85.

[39] J-059. Trial Tr. Dec. 4, 2023 [Doc. No. 173] at 58–61; Trial Tr. Dec. 11, 2023 [Doc. No. 176] at 123.

[40] APA § 6.1.

[41] Trial Tr. Dec. 4, 2023 [Doc. No. 173] at 61; Trial Tr. Dec. 6, 2023 [Doc. 175] at 42; Trial Tr. Dec. 11, 2023 [Doc. No. 176] at 123–24.

[42] Trial Tr. Dec. 5, 2023 [Doc. No. 174] at 204.

[43] Trial Tr. Dec. 13, 2023 [Doc. No. 178] at 26, 84–85.

that Buyer has not yet applied for or has otherwise been unable to obtain certain

licenses to operate the businesses in New York and Pennsylvania and to fulfill other

conditions necessary for its underlying financing[.]"[44]

34.    The fourth "Whereas" clause of the Addendum stated that "Seller is and remains

ready, willing and able to proceed with Closing on the [April 15] Closing Date."[45]

35.    The Addendum did not mention the COVID-19 pandemic or the related shutdowns.

36.    Section 2 of the Addendum, entitled "Postponement of the Closing Date of

Transactions," provided that:

Paragraph 7.1 of the APA, and as applicable any provision of the RPA
regarding closing, shall be amended to the extent necessary to be in
accordance with the following:

The Closing of the Transactions, other than those contemplated by the RPA
(the "*Asset Closing*") shall take place on or before 5:00 p.m. on
Wednesday, September 30, 2020, or such earlier date that the Parties may
agree after the satisfaction of Buyer's conditions precedent set forth in
Section 3(d) (the date on which the Closing actually occurs is hereinafter
referred to as the "*Asset Closing Date*") and the sale, assignment, transfer,
and conveyance to Buyer of the Purchased Assets will be deemed effective
as of close of business on the Asset Closing Date.

In addition, the Closing of the Transactions contemplated by the RPA (the
"*Real Estate Closing*") shall take place on or before 5:00 p.m. on Friday,
July 31, 2020, or such earlier date designated by notice from Buyer to Seller
(the date on which the Closing actually occurs is hereinafter referred to as
the "*Real Estate Closing Date*") and the sale, assignment, transfer, and
conveyance to Buyer of the Properties will be deemed effective as of close
of business on the Real Estate Closing Date. In the event that the Real
Estate Closing occurs prior to the Asset Closing, then Seller will lease the
Properties for a two-month period (but no later than September 30, 2020)
for an amount that equals Buyer's principal, interest, and taxes incurred by
Buyer during such two-month period pursuant to its financing of that
portion of the Purchase Price and as assessed by relevant taxing authorities.
The Parties agree in good faith to negotiate and execute a standard short-

---

[44] Ex. J-003 (hereinafter cited as "Addendum") at 1.

[45] Addendum at 1.

term commercial lease on usual and typical terms.[46]

37.     The Addendum further provided that "in consideration of the Closing Date," Campers

Inn agreed to increase the escrow deposit from $250,000 to $750,000, to be

disbursed:

> (i) against the purchase price at the Real Estate Closing or (ii) released to
> Seller as liquidated damages in the event that Buyer shall fail to close as
> provided in this Addendum and Seller is not otherwise in default. It is the
> specific intent of the Parties that this Paragraph shall abrogate the final
> sentences of APA § 1.4(b)(1) and (2), respectively, as well as the applicable
> provisions of APA § 9.2 concerning liquidated damages.[47]

38.     Under the Addendum, "[i]n the event of any contradiction between the terms of this

Addendum and the Transaction Documents, as defined in the APA, the terms of this

Addendum shall control. Except as modified herein, all terms of the Transaction

Documents, as defined in the APA, shall remain in effect."[48] The APA defines the

"Transaction Documents" as "all documents or other material required to be delivered

by [BNRV] pursuant to this Agreement."[49]

39.     BNRV agreed to a reduction in the purchase price of $1,092,500.[50]

40.     The Addendum required BNRV to "use best efforts to draw-down the existing RV

Inventory . . . without restocking."[51]

41.     The Addendum modified the RPA with regard to title defects:

---

[46] Addendum § 2.

[47] Addendum § 3(a). The referenced sentences of Section 1.4(b) of the APA concerned the disbursement of
the deposit.

[48] Addendum § 4.

[49] APA § 7.2(a)(iii).

[50] Addendum § 3(b).

[51] Addendum § 3(c).

Section 5(c) (Title Defects) will be modified to extend the period to identify title defects from the end of the Inspection Period to (10) days prior to Real Estate Closing; except that if real estate surveys are promptly ordered, but not completed due to no fault of buyer, period for identification of title defects extended for at least three (3) business days after delivery of the Surveys (and closing is extended accordingly). Buyer will seek to obtain all of the approval, surveys, and other required items promptly and work in good faith to obtain them on a timely basis. In addition, Buyer shall identify to Seller the vendor(s) . . . .[52]

42.     The Addendum provided that:

Buyer shall execute a letter of instruction to the Escrow Agent in a form suitable to Seller which shall remain in the possession of Seller until the later of: (a) 5:01 p.m. on July 31, 2020, or (b) if the Closing is postponed to a date past July 31, 2020, due to title defects as set forth in Section 3(e) until such title defects are cured, then promptly upon such title defects being cured, at which time Seller may release the letter of instruction to the Escrow Agent directing Escrow Agent to release the Entire Deposit to Seller.[53]

43.      The parties agreed at some point to move the Asset Closing from September to coincide with Real Estate Closing on July 31, 2020.[54]

44.     The parties also agreed to an escrow/mail-away closing.[55]

45.     The RV market rebounded after initial losses in March and April 2020 and was strong in May and June of 2020.[56]

46.     Both BNRV and Campers Inn intended to close on July 31, 2020 and were working toward that goal in late June and July 2020.

---

[52] Addendum § 3(e).

[53] Addendum § 3(f). Section 3(e) stated that "Section 5(c) (Title Defects) will be modified to extend the period to identify title defects from the end of the Inspection Period to (10) [*sic*] days prior to Real Estate Closing; except that if real estate surveys are promptly ordered, but not completed due to no fault of buyer, period for identification of title defects [is] extended for at least three (3) business days after delivery of the Surveys (and closing is extended accordingly)." Addendum § 3(e).

[54] *See* Ex. J-238.

[55] Trial Tr. Dec. 12, 2023 [Doc. No. 177] at 78–79, 204–05.

[56] Ex. J-222. *See also* Aaron Young Dep. at 36–37.

47.   In the weeks leading up to the revised closing date, Campers Inn's preparations did not proceed in an orderly fashion.

48.   Campers Inn began efforts either to acquire new surveys or to obtain old surveys from BNRV beginning in the latter part of June 2020, approximately five weeks before the closing.

49.   However, Campers Inn rejected as too expensive proposals from survey companies received on June 23 and June 24 to complete the surveys on the Pennsylvania and New York properties, respectively.[57]

50.   Instead Campers Inn sought the advice of a "trusted advisor" to retain survey companies.[58]

51.   Campers Inn engaged surveyors on July 1 for the properties.[59]

52.   Campers Inn could have engaged the surveyors at least a week earlier, and the record does not show that pandemic-related closures prevented earlier action.

53.   Leading up to the closing date, BNRV was winding down its operations and inventory, and Campers Inn was preparing to assume control of the properties.

54.   On July 15, 2020, Jeffrey Hirsch, the CEO of Campers Inn, texted Matthew Jeppsen, the CFO of Campers Inn, that the closing "has to get done by the 31st" and that Campers Inn "will lose a lot of money if they [i.e., BNRV] are not forced to extend."[60]

55.   Jeffrey Hirsch testified that losing money did not refer to the $750,000 deposit but to

---

[57] Exs. J-229, J-025, J-029; Trial Tr. Dec. 12, 2023 [Doc. No. 177] at 200-01.

[58] Trial Tr. Dec. 11, 2023 [Doc. No. 176] at 155–56, 162, 166.

[59] Exs. J-231, J-034, J-080.

[60] Ex. J-045.

the loss of summer sales if the deal were not completed, but the language "has to get done by the 31st" speaks for itself.

56.     The Court finds that Jeffrey Hirsch's explanation is not credible because, if BNRV were "forced to extend," Campers Inn would have lost more of the summer sales period.

57.      The natural meaning of the text is that Campers Inn knew that July 31 was a hard deadline for the closing.[61]

58.     On July 20, 2020, in-house counsel for BNRV (Shields) emailed counsel for Campers Inn (Traylor), stating that BNRV had "received notification from Mr. Hirsch that this matter does appear targeted for a closing prior to 7/31" and asking for information about the status of documents "so that we can eliminate the possibility of further delays."[62]

59.     On July 21, 2020, Geof Hoffman, BNRV's corporate manager, sent an email to Jeffrey Hirsch following up on the previous day's email from Shields to Traylor, to which Traylor had not responded, and noted the importance of a timely response, with "[t]ime being of the essence."[63]

60.     Jeffrey Hirsch responded to this email stating that it would be addressed with Traylor, and did not take issue with the characterization of time being of the essence.[64]

---

[61] Trial Tr. Dec. 11, 2023 [Doc. No. 176] at 174–75.

[62] Ex. J-066.

[63] Ex. J-066.

[64] Ex. J-066. BNRV notes that a consultant for Campers Inn, Joseph Sagneri, also used "time is of the essence" in emails, and no one at Campers Inn disagreed. *See* J-025; J-089. The Court does not accord significant weight to statements made by the consultant.

61.     New surveys were obtained by Campers Inn by July 28, 2020.[65]

62.     Campers Inn did not request an extension of the closing date before July 31, 2020.

63.     On July 30, 2020, Michael Gollnitz of M&T Bank notified Traylor that M&T Bank

        needed "all outstanding items, besides post-closing items, cleared up and sent to us by

        10:00 [a.m.] at the latest. . . . I am not budging on the 10:00 [a.m.] deadline."[66]

64.     Not all of the documents were provided one day in advance of the closing as required

        for the escrow/mail-away closing.[67]

65.     The deeds were prepared by the title insurance companies retained by Campers Inn,

        and counsel for Campers Inn prepared the closing statements.[68]

66.     The New York deed and related documents were sent to BNRV on July 28, 2020.[69]

67.     The title company for the Pennsylvania property transmitted the deed to counsel for

        BNRV at 11:55 p.m. on Thursday, July 30, 2020, with a note that "the deed cannot

        yet be signed as it does not have the legal description attached. Our attorney expects

        to receive the updated survey Friday morning . . . . At that point, I can distribute the

        Deed and the seller can sign and return to me, via overnight mail, for receipt by

        Monday."[70]

68.     Ross Chafin, an attorney for Campers Inn, emailed the title company for the

        Pennsylvania property at 12:12 a.m.[71] on July 31, and, apparently having written the

---

[65] Exs. J-235, J-023; Trial Tr. Dec. 12, 2023 [Doc. No. 177] at 113, 116.

[66] Ex. J-047.

[67] Trial Tr. Dec. 11, 2023 [Doc. No. 176] at 73.

[68] Ex. J-160.

[69] Trial Tr. Dec. 12, 2023 [Doc. No. 177] at 120–32; Ex. J-236.

[70] Trial Tr. Dec. 5, 2023 [Doc. No. 174] at 174; Ex. J-556.

[71] The email shows the time as 00:12:27.

email before midnight, wrote that "[t]he closing date should stay as tomorrow 7/31/2020, as that is the last day of the contract to close by. It is imperative we close tomorrow."[72]

69.     At 12:20 p.m. on July 31, 2020, Chafin sent by email the buyer-signed documents for the Pennsylvania property to the title company, seeking confirmation "[s]o that we know we're moving in the right direction," requesting assurance that "the attached documents (together with a final buyer-signed counterpart to the closing statement, once finalized) is everything you will need document-wise from the Buyer for closing," and emphasizing that "it is important that we close and fund today, provided all other components of the transaction are in (i.e., seller has sufficiently delivered the deed to you and you have all funds for escrow disbursement according to the closing statement)."[73]

70.     Chafin sent additional closing documents to BNRV for signature at 1:05 p.m. on July 31, 2020.[74]

71.     At 2:19 p.m. on July 31, Shields emailed Traylor that Littlefield was "signing the new docs that came over after 1[:00] p.m.", to which Traylor responded at 2:24 p.m.: "Just talked to M&T. They say the wiring window is shut because all documents weren't completed for their internal approval by 2[:00 p.m.]."[75]

---

[72] Ex. J-165. The email also noted that "[t]he lender is requiring we have everything shored up by 10:00 [a m.] in the morning (at least as far as the buyer/borrower is concerned; we cannot control any sell requirements or deliverables.").

[73] Ex. J-069 (emphasis omitted).

[74] Ex. J-245.

[75] Ex. J-068. After Shields responded that it was "[i]nformation that would have been helpful a week ago," Traylor agreed and stated that "I think we'll have everything done today and funding will [have] to come on Monday." *Id. See* J-248 (email from Gollnitz stating a 2:00 p m. cut off time).

72.     BNRV had a subordination agreement related to a promissory note secured by a mortgage on the PA property.[76]

73.     BNRV also used M&T Bank, and BNRV's banker, Hersch Gornbein, notified Littlefield on July 31 not to terminate the mortgage and mortgage swap on the Pennsylvania property because Campers Inn would not meet the wire deadline.[77]

74.     At 4:07 p.m. on July 31, Gollnitz of M&T Bank sent an email to Traylor stating that "[i]n anticipation of receiving all closing requirements from all parties, including but not limited to the issuance of title insurance on both the NY and PA property, we will be in a position to fund in accordance with the loan documents."[78]

75.     The email did not state when M&T would be prepared to fund the transaction, and M&T had already stated that it would not fund on July 31.

76.     On July 31, 2020, Campers Inn and M&T Bank entered into a Post-Closing Agreement concerning the New York and Pennsylvania properties as well as unrelated properties.[79]

77.     The Post-Closing Agreement stated that certain documents would be provided by August 15, 2020, or August 30, 2020. It did not state when the transactions would be funded.[80]

---

[76] Trial Tr. Dec. 5, 2023 [Doc. No. 174] at 53. *See also* Ex. J-243 (email from Shields dated July 31, 2020, at 10:49 a.m., stating that BNRV required the final settlement statement for Pennsylvania so that the interest rate swap could be completed).

[77] Trial Tr. Dec. 4, 2023 [Doc. No. 173] at 85–87; Trial Tr. Dec. 5, 2023 [Doc. No. 174] at 77–79. On July 30, 2020, Gornbein asked BNRV whether they anticipated "closing and funding today," to which Shields responded that "[e]verything appears to be in order for a closing tomorrow." Ex. J-241.

[78] Ex. J-132.

[79] Ex. J-288; Trial Tr. Dec. 12, 2023 [Doc. No. 177] at 107–09.

[80] Ex. J-288.

78. The New York title insurance company representative stated on July 31 at 2:20 p.m., after the funding deadline had passed, that it had the necessary documents on the buyer's side and was double checking that it had everything on the seller's side.[81]

79. The Pennsylvania title insurance company confirmed on July 31 at 5:46 p.m. that the documents were in recordable form and that it was in a position to insure the title to the property, after receiving the closing documents at 4:49 p.m. that day.[82]

80. Campers Inn had not submitted all required paperwork to fund the transaction before the wire window closed.[83]

81. On July 31, Littlefield was in Georgia, and was informed that the title insurance company was asking for wet (i.e., original rather than scanned or faxed) signatures for the deed to be sent to Pennsylvania.[84]

82. The parties had agreed to a mail-away closing, and there was no requirement in writing given to BNRV before the closing date that wet signatures were required, only that the signatures should be in dark ink for scanning.[85]

83. Both BNRV and Campers Inn treated July 31, 2020, as a hard deadline for the closing.

84. The Court finds that the transactions did not close by 5:00 p.m. on July 31, 2020, because Campers Inn did not meet the deadline set by its bank.

85. Campers Inn did not meet M&T Bank's deadline for funding, and that is the reason

---

[81] Ex. J-327

[82] Ex. J-328.

[83] Trial Tr. Dec. 12, 2023 [Doc. No. 177] at 212–20.

[84] Trial Tr. Dec. 5, 2023 [Doc. No. 174] at 64–65.

[85] Ex. J-556; *see also* Trial Tr. Dec. 5, 2023 [Doc. No. 174] at 175–76; Shields Dep. Vol. II at 72 ("I think I found out on the 31st from sellers that the title agencies required we signatures").

the transaction did not close on July 31.

86.    Article IX of the APA governed termination and provided in full:

## ARTICLE IX
## TERMINATION OF AGREEMENT

**9.1. TERMINATION.** This Agreement may be terminated at any time:
(a) by Buyer in the event that it is unable to satisfy one or both of the conditions set forth in Sections 6.l(g) and 6.1(h) within the applicable 30-day time period or any extension thereof, in which event the Deposit shall be returned by Escrow Agent to Buyer;
(b) by mutual written consent of the Parties;
(c) by any Party if the Closing shall not have occurred by April 15, 2020, and the Party seeking termination is ready, willing and able to close and not in material default of its obligations under this Agreement; or
(d) by any Party if there shall have been a material misrepresentation or breach of
representation or warranty or a breach of a material covenant on the part of the other Party, which misrepresentation or breach is not cured prior to the Closing.

**9.2 EFFECT OF TERMINATION.** In the event of termination of this Agreement pursuant to this Section, this Agreement shall terminate and there shall be no further liability on the part of Seller or Buyer under this Agreement; *provided*, *however*, that nothing in this Section shall relieve a breaching or defaulting Party from liability arising from any breach or default of a covenant of this Agreement prior to termination and applicable to the period prior to the Closing; and *further provided*, that if Seller is ready, willing and able to consummate the Transactions and Buyer fails to consummate such Transactions in accordance with the provisions of this Agreement, for any reason other than the non-satisfaction of any of the conditions set forth in Sections 6.l(b) - 6.l(f), the Deposit shall be delivered to Seller as liquidated damages, which shall be Seller's sole and exclusive remedy against Buyer, at which time this Agreement shall be null and void and neither party shall have any rights or obligations under this Agreement. In the event either Party becomes entitled to the delivery of the Deposit upon termination of this Agreement, Buyer and Seller covenant and agree to deliver a letter of instruction to the Escrow Agent directing the disbursement of the Deposit to the party entitled thereto. In the event either Party hereto fails or refuses to sign or deliver such an instruction letter when the other Party is entitled to a disbursement of the Deposit, then the Party so failing or refusing to sign or deliver such letter shall pay, upon the final order of a court with appropriate jurisdiction stating that such other party is entitled to a disbursement of the Deposit, all reasonable attorneys' fees and

court costs incurred by the party so entitled to the Deposit in connection with its recovery.[86]

87.     On August 2, BNRV sent a letter demanding release of the $750,000 deposit as liquidated damages.[87]

88.     On August 3, Traylor wrote a letter in response that the closing was extended based on the period for identification of title defects and that it had not received the certificate of occupancy and zoning compliance letters as to the New York property.[88]

89.     The August 3 letter stated that "Time is of the essence for Seller to satisfy its obligations under all agreements and to mitigate the avoidable, but readily ascertainable and certain, damages to be incurred by Buyer, not later than 2:00 p.m, August 5, 2020."[89]

90.     The August 3 letter did not state that the closing would occur on August 5.

91.     To the extent that Campers Inn sought on August 3, 2020, to identify title defects as a basis to delay the closing under the Addendum, the Court finds that Campers Inn failed to order the surveys in a timely manner and therefore any purported title defects did not provide a basis for delay.[90]

92.     Campers Inn has not shown that there were any title defects that would have justified an extension, or that issues identified in the August 3 letter prevented the transaction from closing.

93.     The Court finds credible the testimony of Littlefield that he was prepared to go

---

[86] APA §§ 9.1, 9.2.

[87] Ex. J-170.

[88] Ex. J-257.

[89] Ex. J-257.

[90] It does not appear that Campers Inn is pursuing an argument as to any title defects.

forward with the closing on July 31 until he learned that the Bank would not fund the transaction that day.[91]

94. The Court also finds credible Littlefield's testimony that after July 31, he did not have any confidence that Campers Inn would close the deal, considering the prior events.[92]

95. The Court finds that closing by July 31, 2020 at 5:00 p.m. was essential to the parties' agreements and that no extension of this second closing date was reasonable unless all parties agreed.[93]

96. BNRV considered the agreements terminated when the closing did not occur.

97. After July 31, Benjamin Hirsch, the COO of Campers Inn, and Jeffrey Hirsch, CEO of Campers Inn, discussed by text various options for moving forward, such as an option to buy the real estate over a period of 19 to 48 months, which shows awareness that the transaction had terminated on July 31.[94]

98. After the deal failed to close on July 31, Littlefield communicated with Camping World that weekend about a possible sale.[95]

99. The Court finds credible Littlefield's testimony that he did not have any discussions with Camping World about an acquisition before the transaction failed to close, and

---

[91] Trial Tr. Dec. 5, 2023 [Doc. No. 174] at 84.

[92] Trial Tr. Dec. 4, 2023 [Doc. No. 173] at 87 ("Well, I just thought to myself, here we go again. And I figured it wasn't going to close.").

[93] The Court has considered the fact that the Addendum did not carry forward the time of the essence language from the APA and that such language was struck from drafts of the Addendum.

[94] Ex. J-056.

[95] Trial Tr. Dec. 5, 2023 [Doc. No. 174] at 15–16. Littlefield testified that Josh Erickson of Camping World contacted him first. Trial Tr. Dec. 5, 2023 [Doc. No. 174] at 18. However, there are text messages among Camping World individuals indicating that Littlefield first reached out to them. Ex. J-304. Again, the Court finds that evidence does not support that Littlefield shopped the deal before the failed closing. Therefore, this dispute is not relevant.

the evidence does not support that there were any negotiations before then.[96]

100.   In addition, the facts of the transaction were known in the industry, as "once you announce it publicly, confidentiality's out the window."[97]

101.   On August 3, 2020, BNRV sent Camping World appraisals that were obtained by BNRV in 2019.[98]

102.   Later in August 2020, BNRV's counsel, Shields, sent Camping World certain documents related to the title insurance and the surveys that were obtained in connection with the failed transaction.[99]

103.   BNRV and Camping World (and its affiliates) entered into agreements on August 19, 2020, for a total purchase price of $17,667,500.[100]

104.   The purchase price was more than $1,000,000 higher than the adjusted purchase price for the failed BNRV-Campers Inn transaction.

105.   The transaction between BNRV and Camping World closed in mid-October 2020.[101]

106.   Considering the enhanced purchase price, BNRV did not suffer any loss as a result of the failed transaction.

---

[96] Trial Tr. Dec. 5, 2023 [Doc. No. 174] at 9. A store manager at Camping World, Tammy Hopkins, spoke with Littlefield on or about July 27 about a pontoon boat, inquired as to the how the closing was going, and said that Camping World was in acquisition mode. Littlefield testified that he did not engage with Hopkins about the closing. Trial Tr. Dec. 5, 2023 [Doc. No. 174] at 9–11. The text messages sent by Hopkins to another individual at most indicate that Littlefield expressed to her that he didn't think the transaction would close.

[97] Trial Tr. Dec. 6, 2023 [Doc. No. 175] at 59. *See also* Aaron Young Dep. at 12 ("I just think it's public knowledge. Campers Inn announced back in March of 2020 that they had acquired a New York store and a Pennsylvania store from Boat and RV, and after, you know, it got into June, July, people started wondering was the deal going to fall apart or not. It didn't close, so I think most everyone in our industry knows now that it didn't sell to Campers Inn and it ended up selling to Camping World.")

[98] Ex. J-306.

[99] *See, e.g.,* Exs. J-263, J-267, J-268.

[100] Exs. J-310, J-271 – J-276.

[101] Trial Tr. Dec. 5, 2023 [Doc. No. 174] at 20.

## II.    CONCLUSIONS OF LAW[102]

To obtain a judgment for breach of contract under New York law, a plaintiff must establish that "(1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages," which may consist of compensatory or nominal damages.[103] A material breach by one party excuses the nonbreaching party from further performance.[104] To be material, a breach must go to the root of the parties' agreement.[105]

In interpreting a contract under New York law,

[w]hen parties set down their agreement in a clear, complete document, their writing should be enforced according to its terms, and this rule is applied with special force in the context of real property transactions, where commercial certainty is a paramount concern, and where the instrument was negotiated between sophisticated, counseled business people negotiating at arm's length. Courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.[106]

The Addendum set a specific closing date and time of July 31, 2020 at 5:00 p.m., which was a significant extension from the original closing date of April 15, 2020. All parties understood this revised date to be a firm deadline. The Addendum provided for an extension of the closing only if Campers Inn promptly ordered the surveys and then identified title defects. As Campers Inn did not promptly order the surveys, this contingency does not apply. Campers Inn

---

[102] The Court reaches its legal conclusions by a preponderance of the evidence.

[103] *34-06 73, LLC v. Seneca Ins. Co.*, 198 N.E.3d 1282, 1287 (N.Y. 2022) (citations omitted).

[104] *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 117 (2d Cir. 2006) (applying New York law).

[105] *Id.* (citations omitted).

[106] *Riverside S. Plan. Corp. v. CRP/Extell Riverside, L.P.*, 920 N.E.2d 359, 403–04 (N.Y. 2009) (quotation marks and citations omitted).

did not even seek to identify any defects until after the July 31 deadline had passed. Campers Inn failed to close on July 31, 2020, after having acknowledged it was not ready to close on April 15, 2020. Moreover, as the parties had agreed to a mail-away or escrow closing, the documents should have been provided the day before, on July 30, 2020. Considering "the nature and object of the contract, the previous conduct of the parties, the presence or absence of good faith, the experience of the parties and the possibility of prejudice or hardship to either one, as well as the specific number of days provided for performance," no further extension was reasonable without the agreement of all parties.[107] Thus, "a 'time of the essence' provision [is] unnecessary" to reach this conclusion.[108]

Because BNRV sustained its burden of demonstrating that it was ready, willing, and able to convey title in accordance with the agreements, and Campers Inn did not secure the funding on time, BNRV was not required to continue to sign documents once the closing could not be completed.[109] Under § 9.2 of the APA, the agreements terminated and became null and void once the closing did not occur.[110]

Campers Inn cannot prevail on its counterclaim for specific performance. "A party seeking specific performance of a contract for the sale of real property is required to establish not only that he or she was ready, willing, and able to close on the scheduled closing date, but also

---

[107] *Zev v. Merman*, 533 N.E.2d 669 (N.Y. 1988) (citations omitted).

[108] *USA Recycling Inc. v. Baldwin Endico Realty Assocs., Inc.*, 139 N.Y.S.3d 529, 530 (App. Div. 2021) (citation omitted).

[109] *Cf. Pesa v. Yoma Dev. Grp., Inc.*, 965 N.E.2d 228, 230 (N.Y. 2012).

[110] Campers Inn argues that the agreements did not terminate automatically because § 9.1 of the APA states that it "may" be terminated, and BNRV did not send formal written notice of termination until August 7, 2020. Ex. J-258.  The Court rejects this argument. The APA specifies that *mutual* termination must be in writing. APA § 9.1(b).  However, termination by a party in the event that the closing does not occur on time is *not* required to be in writing or delivered at any particular time. APA § 9.1(c). The agreements were terminated once the closing did not occur by 5:00 p.m. on July 31, 2020, in accordance with § 9.2 of the APA.

that the other party was in default."[111] As the Court has found that Campers Inn was responsible for having been unable to close on July 31, judgment will be entered in favor of BNRV on the counterclaim for specific performance.

BNRV did not breach the "no shop" provision, because the provision by its terms ended on the closing date and the Court has found as a matter of fact that there were no prohibited communications with Camping World until after July 31, 2020.[112] Nor has Campers Inn established a basis to prevail under the confidentiality clause. To the extent that the clause survived the termination the transaction, the documents at issue were not proprietary information relating to Campers Inn but were documents such as surveys and title information.[113]

BNRV seeks an award of the escrow payment of $750,000. Under New York law,

> [w]hether a contractual provision represents a liquidated damages provision is a question of law for the court to resolve. Liquidated damages provisions will be upheld only if the amount fixed is a reasonable measure of the probable actual loss in the event of a breach. If the amount fixed is grossly disproportionate to the amount of actual damages, then the liquidated damages provision amounts to a penalty and will not be enforced.[114]

"[E]quity abhors forfeitures and courts will examine the sum reserved under an instrument as liquidated damages to insure that it is not disproportionate to the damages actually arising from the breach or designed to coerce the performance of a party."[115] Thus, although the

---

[111] *141 Park Ave. Realties, Inc. v. 141 Park Ave. Holdings, LLC*, 189 N.Y.S.3d 604, 606 (App. Div. 2023) (citations omitted).

[112] APA § 4.3.

[113] Even if Campers Inn had established a breach of the confidentiality clause, it did not establish any damages, and therefore the Court would have awarded only nominal damages. *Connaughton v. Chipotle Mexican Grill, Inc.*, 75 N.E.3d 1159, 1164 (N.Y. 2017) (observing that "nominal damages are typically available in a contracts case to vindicate a party's contractual rights").

[114] *G3-Purves St., LLC v. Thomson Purves, LLC*, 953 N.Y.S.2d 109, 113 (App. Div. 2012) (quotation marks and citations omitted).

[115] *Fifty States Mgmt. Corp. v. Pioneer Auto Parks, Inc.*, 389 N.E.2d 113, 116 (N.Y. 1979) (citation omitted).

APA allows BNRV to retain the deposit as liquidated damages, "the amount of liquidated damages must bear some fair relation to the amount of damages actually suffered" by BNRV.[116]

In this case, counsel for Campers Inn explicitly stated, "We never raised penalty as an affirmative defense. We never mentioned it in a pleading. It was not a defense."[117] However, "[a]lthough the party challenging the liquidated damages provision has the burden to prove that the liquidated damages are, in fact, an unenforceable penalty, the party seeking to enforce the provision must necessarily have been damaged in order for the provision to apply."[118] Given that BNRV obtained a substantially higher price in the sale to Camping World, it has not shown that it was damaged. Therefore, the Court concludes that the provision does not apply, and BNRV cannot recover liquidated damages.[119]

BNRV also seeks cancellation of the notices of *lis pendens* filed by Campers Inn. As the litigation is concluded and the Court determines that Campers Inn has no claim to the properties, the notices will be canceled to the extent that they are still in effect.[120]

---

[116] *BHMC Enters., Inc. v. Budget Wines & Liquors, Inc.*, 13 Misc. 3d 1217(A), 831 N.Y.S.2d 346 (Sup. Ct. 2006).

[117] Trial Tr. Dec. 5, 2023 [Doc. No. 174] at 4 (statement of James Smith, Esquire).

[118] *Rubin v. Napoli Bern Ripka Shkolnik, LLP*, 118 N.Y.S.3d 4, 7 (App. Div. 2020) (citations omitted).

[119] As BNRV cannot recover the liquidated damages, it is not entitled to attorney's fees under § 9.2 of the APA.

[120] With respect to the New York property, "[a] notice of pendency shall be effective for a period of three years from the date of filing." N.Y. C.P.L.R. 6513. However, "[b]efore expiration of a period or extended period, the court, upon motion of the plaintiff and upon such notice as it may require, for good cause shown, may grant an extension for a like additional period," and "[a]n extension order shall be filed, recorded and indexed before expiration of the prior period." *Id.*; *see also U.S. Bank Tr., N. Am. v. Green-Stevenson*, 174 N.Y.S.3d 124, 126 (App. Div. 2022). Regarding the Pennsylvania property, "if title to the property is not subject to the result of the litigation, then there is no reason to provide notice to a third party about the litigation." *Biros v. Am. Harness Tracks, LLC*, No. 1219 WDA 2022, 2024 WL 244958, at *2 (Pa. Super. Ct. Jan. 23, 2024) (quotation marks and citation omitted).

### III.    CONCLUSION

The Court has considered carefully the evidence and the arguments of counsel and, as detailed above, concludes that Campers Inn failed to timely close and no further extension of the closing was reasonable. The Court finds that Campers Inn has no claim to the properties or to damages. The Court will enter judgment in favor of BNRV limited to that determination and will not award liquidated damages or counsel fees.